LAW OFFICES OF MICHAEL S. LAMONSOFF, PLLC
Attorneys for Plaintiff, FERNANDO BERMUDEZ
80 Maiden Lane, 12th Floor
New York, New York 10038
Telephone: (212)962-1020
Fax: (212) 962-3078
Michael S. Lamonsoff (MSL 1673

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
FERNANDO BERMUDEZ,

                    Plaintiff,

             -against-

THE CITY OF NEW YORK; ASSISTANT DISTRICT
ATTORNEY JAMES RODRIGUEZ, WHO IS OR WAS
AN ASSISTANT DISTRICT ATTORNEY OF
NEW YORK COUNTY, IN HIS INDIVIDUAL CAPACITY;
MICHAEL LENTINI, WILLIAM FITZPATRICK, DANIEL MASSANOVA,
JOHN MULALLEY, _____ BAKER (FIRST NAME UNKNOWN),
AND _____ MULCAHY (FIRST NAME UNKNOWN),
VARIOUS JOHN/JANE DOES, WHO ARE OR WERE OFFICES
OF THE NEW YORK CITY POLICE DEPARTMENT,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK,

                    Defendants.
----------------------------------------------------------------------X

**AMENDED COMPLAINT**

Index No.: 11 civ 0750

JURY TRIAL DEMANDED

Plaintiff **FERNANDO BERMUDEZ,** by his attorneys, The Law Offices of MICHAEL

S. LAMONSOFF as and for his Verified Complaint against Defendants. upon information and

belief at all times hereinafter alleges:

## JURISDICTION

1.      This action is brought under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments of the Constitution of the United States and the Civil Rights Law of the United

States, as codified in Title 28, U.S.C. Sections 1331 and 1343 and Title 42, U.S.C. Sections 1981, 1983, and 1985.

2.    Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under State Law.

## VENUE

3.    The course of conduct and other acts complained of herein arose and occurred in whole or in part within the County of New York, in the Southern District of New York.

4.    Venue is proper in this Court pursuant to 28 U.S.C. Section 1391.

## PARTIES

5.    Plaintiff is a citizen of the United States who at all times relevant to this action resided within the Southern District of New York and is currently a resident of the State of Connecticut.

6.    That at all times hereinafter mentioned the defendant, THE CITY OF NEW YORK(hereinafter referred to as CITY) was, and still is, a municipal corporation duly authorized and existing under and by virtue of the laws of the State of New York.

7.    The NEW YORK CITY POLICE DEPARTMENT (hereinafter referred to as NYPD) is a municipal agency under the supervision and control of the defendant CITY, and at all relevant times employed defendant police officers named herein.

8.    Defendant, James Rodriguez, all times relevant to this complaint was a duly appointed and acting Assistant District Attorney of New York County acting under the color of law pursuant to the statutes, ordinances, regulations, policy customs and usage of the City of New York and the State of New York.

9.     Herculano Izquierdo all times relevant to this complaint was a duly appointed and acting Assistant District Attorney of New York County acting under the color of law pursuant to the statutes, ordinances, regulations, policy customs and usage of the City of New York and the State of New York.

10.     That the defendant Assistant District Attorney Rodriguez (hereinafter ADA Rodriguez) is being sued in his individual capacity.

11.     Defendant, Michael Lentini, at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

12.     Defendant, William Fitzpatrick, at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

13.     Defendant, Daniel Massanova, at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

14.     Defendant, John Mulalley, at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

15.     Defendant, _____ Mulcahy (first name unknown), at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

16.     Defendants various John/Jane Doe(s), at all times relevant to this complaint were duly appointed and acting police officers of the NYPD acting under the color of law pursuant to the statutes, ordinances, policy customs, and usage of the City of New York and the State of New York.

17.     That all of the defendant police officers named herein are being sued both individually and in their official capacity.

## JURY DEMAND

18.     Plaintiff demands trial by jury of all issues raised in this Complaint.

## CONDITIONS PRECEDENT

19.     That the plaintiff caused a Notice of Claim to be served upon the defendant CITY on February 9, 2010, within ninety (90) days of the date of the accrual of the causes of action in this complaint.

20.     That more than thirty (30) days have elapsed since the presentation of said notice of claim, and that said claim remains unadjusted and that the Defendant, CITY, has wholly refused, failed and neglected to make any adjustments of same.

21.     On the 5th day of August 2010 an oral examination of the plaintiff, FERNANDO BERMUDEZ, was conducted by defendant's CITY.

22.     That is action is being commenced within one (1) year and ninety (90) days of the date of the accrual of the cause of actions in this complaint.

## FACTUAL AND PROCEDURAL HISTORY

### The Crime

23.     In the afternoon and early evening of Saturday, August 3, 1991, a crowd of teenagers gathered in the schoolyard of P.S. 84 on West 92nd Street in Manhattan and discussed going downtown that night to a paid "party" at the Marc Ballroom. Among those who gathered in the schoolyard was Luis "Lou" Munoz, age 19, also known as "Wool Lou," of 136 West 91st Street. Also among them was Efrain Lopez ("Lopez"), also known as "Pito," "Pistol Pete," and "Shorty."

24.     Lopez had grown up in the neighborhood, at 589 Amsterdam Avenue, between West 88th and 89th Streets, and had attended P.S. 84. He had lived with his grandmother, Elena Cordero, at 74 West 92nd Street.

25.     Lopez, his half-brother Johnny Cordero, Luis Munoz, and others had grown up together, hanging around the projects and playgrounds in the neighborhood. Together they had broken into cars, sometimes getting caught. In June 1990, Lopez's brother Johnny Cordero, Luis Munoz, and two other neighborhood young men had been arrested together on a car theft charge.

26.     Lopez, age 16, had spent large chunks of the previous two years in some form of juvenile correction because of his car thefts. A few days before the murder giving rise to this case, he had been sent down after eight months at Georgetown Correctional Facility to start a work release program at Edgecomb Correctional Facility in Manhattan.

27.     On August 3, 1991, Lopez had been let out on a Saturday-to-Wednesday home visit furlough from Edgecomb, at around 10 a.m. In the afternoon he went to see his friends at the schoolyard, where many of them were gathering to go to Marc Ballroom.

28.    Also among those gathering to go downtown that night were Luis Munoz's sister, Elizabeth, or "Lisa", Munoz; Anthony Steward of 206 West 88th Street; Marisol Cruz of 100 West 92nd Street; Spencer Rivera of 100 West 93rd Street; Robert Morales of 132 West 91st Street; Carmen Daniell of 24 West 91st Street, Annette Garcia of 132 West 91st Street; Celina Carrion of 733 Amsterdam Avenue, and others.

29.    The victim in this case, Raymond "Dread" Blount, was also at the Marc Ballroom with his own crowd of friends.

30.    At around midnight, as the "party" progressed, Lopez got into a verbal confrontation with Blount, who struck Lopez with a blow to the face, knocking him to the floor. Several people broke up the altercation, including Blount's friend Lawrence Darden and Lopez's friend Anthony Steward.

31.    A large crowd gathered around the combatants as the incident was broken up; numerous friends of Blount's either saw the assault or saw Lopez shortly afterwards with his face swollen and red.

32.    Lopez was angry. He went to use the phone and then sat down in the lounge area near the entrance to the dance floor. Blount's friends later observed Lopez surrounded by male and female friends, still upset over the incident. Blount and his friends suspected there might be trouble later on.

33.    At about 3:00 a.m., the "party" ended, and the various crowds of teenagers left the Marc Ballroom. At the entrance, Luis Munoz asked Lopez to point out the person who had hit him. When Blount and his friends came out, Lopez pointed Blount out to Munoz. Blount's friends than observed the same group of young men who had been with Lopez inside the Marc Ballroom together with some others, throwing bottles and "acting rowdy."

34.     Munoz approached a Nissan Pathfinder that was parked in front of the Marc Ballroom and spoke to someone inside. Lopez then followed Blount's group as they walked south on Union Square West, while Munoz joined up with the rest of their West 92nd Street neighborhood crowd. They then pursued Blount's group from the other side of the street. Darden, Blount, and other members of their group, noticing that Lopez was following them with a 40-ounce beer bottle in his hand, became apprehensive as they made their way south on Union Square West. Blount tried to stay in front of his group, away from Lopez.

35.     The now rather large group from the West 92nd Street neighborhood started throwing and breaking 40-ounce beer bottles.

36.     Some members of Blount's group, in response, prepared for what they believed would be a fight. As Blount's group crossed 13th Street, the Pathfinder suddenly drove down and stopped in front of them, partially mounting the sidewalk and cutting off some of Blount's group. A "fat Puerto Rican guy" got out of the passenger side of the Pathfinder, verbally confronting the group and waving a cane around, asking things like "Who snuffed my man?" and "is that your homeboy?" indicating Blount.

37.     While Blount and his friends were stopped at the corner of 13th Street, and Darden engaged in conversation with the big person waving his cane around, Lopez joined up with Munoz in the intersection, again pointed Blount out, and said "That's him," whereupon Munoz took a gun from behind his back and shot Blount in the abdomen, an injury from which he died some hours later.

38.     Chaos ensued. Members of Lopez's group chased and beat up at least two of Blount's friends from the group as they tried to flee. These victims ended up being two of the stranger-on-stranger identifying eyewitnesses in this case, Frank Kent and Michael Thompson.

Kent was stabbed with a knife by his pursuers, as was a woman in a cab which Kent tried to enter as he tried to flee from his assailants. In addition, Kent's jacket was ripped off him and taken by one of his attackers. Thompson was beaten up, chased, and beaten up again by numerous assailants.

39.    Lopez took a cab to 89th Street and Amsterdam, the building where he had grown up, and went to the apartment of his friend Wilfredo Maldonado, with his face bruised, telling Maldonado that "there was a problem and he needed somewhere to stay." Spencer Rivera also asked to stay in Maldonado's apartment for awhile, having been involved in the incident as well.

**The Investigation**

40.    Officers rounded up a number of Blount's friends and acquaintances, who spent all day, Sunday August 4, at the Sixth Precinct being questioned and looking through mug books. Detective Daniel Massonova was the assigned homicide detective.

41.    Among the witnesses at the Sixth Precinct were Blount's best friends, Lawrence Darden, Nkosi Boyce and Terrence Hall, who had all been standing next to Blount when he was shot.  There was also a group of acquaintances of theirs who had also been nearby when the shooting happened, Jaime Velasquez, Okpa Iyesi, Michael Thompson, Frank Kent, Hasani Woodard, Angelo Maysonet and David Selditch.

42.    There are very few recorded witnesses descriptions of the shooter from that day. A contemporaneous patrol supervisor's report from the crime scene gave a witness description of "male Hispanic, 5'9", 20 years old." A DD5 for Lawrence Darden described the shooter as 5'9", 150 pounds.  Testimony demonstrates that witnesses also described a "fade" haircut.  As demonstrated on the Lopez videotape, witnesses also described a T-shirt with words on the back. Even to this day, the defendants have never disclosed what those words were.

43.     As a result of the witnesses' search through mug books that day, only one mug shot was chosen as a possible suspect in the crime. Detective Mulcahy signed a "Records Search Request" for one Robert Ortega, whose mug shot in some ways resembled the descriptions of the shooter as having a "fade" style haircut.

44.     At around five o'clock that afternoon, detectives took eight witnesses uptown to the CATCH Unit to view mug shots. They were taken in squad cars, in two separate groups.

45.     Detectives Lentini and Fitzpatrick of the Sixth Precinct took Darden, Boyce and Hall (good friends of Blount's, all, like him, from Queens). Two Task Force detectives took Velazquez, Iyesi, Hasani Woodard and Thompson (Lower East Side neighborhood friends, acquaintances of Blount's group). Kent was taken there after his release from the hospital.

46.     Detective Lentini sat down with the witnesses all together at one table to obtain a "collective" description of the two people being "keyed" on; First, the teenager who had been punched by Blount and had later pointed Blount out to the shooter.

47.     He was referred to by the witnesses as "Shorty" and "collectively" described as a "male Hispanic, 16, five four, approximately 120 pounds". Second, the shooter himself, who was "collectively" described as "male Hispanic, 16 to 26, five eleven approximately 165 pounds."

48.     Two mug shot drawers corresponding to the description for "Shorty" were pulled out and one each was given to Lawrence Darden and Nkosi Boyce. Terrence Hall may or may not have been given a drawer. Each drawer had about two hundred photos in it. Darden chose a photo and announced that it was "Shorty". All the witnesses were present and looked and agreed that it was "Shorty". Detective Lentini called the NYSIIS number for the "Shorty" mug shot in

to the Sixth Precinct. After this photo identification was made Darden, Hall and Boyce left the room.

49.    Jamie Velazquez was given a mug shot drawer corresponding to the description of the shooter. It is not clear, but apparently Okpa Iyesi, Michael Thompson, Hasani Woodard and Frank Kent, may also have been given mug shot drawers to look through, corresponding to the description of the shooter. Again, at most, each witness was given one drawer, and one drawer only, to look through.

50.    The exhausted teenagers talked and joked as they looked through pictures together. Jaime Velazquez picked out a picture and handed it to Detective Lentini, telling him that the picture looked like someone at the scene. Detective Lentini called the NYSIIS number in to the Sixth Precinct. This person's profile shot showed that he had a prominent ponytail. His name turned out to be Wilmer Rodriguez.

51.    Velazquez then showed another mug shot to the other witnesses present, saying something like, "Look at this one," or "Look at this cutie," and the witnesses in the room looked at it together. This second mug shot was a picture of Fernando Bermudez, of 590 West 204th Street (whose mug shot had been placed in the CATCH Unit after a November 1990 marijuana arrest). This color mug shot showed Mr. Bermudez with a "fade" haircut, no ponytail; brown eyes which appeared greenish or hazel in the color mug shot, and stubbly facial hair over a large portion of his face.

52.    Only four witnesses who jointly viewed the Bermudez mug shot – Velazquez, Iyesi, Kent and Thompson – came to a communal agreement that the Bermudez mug shot either resembled the shooter or someone that was at the club, Kent remarking that a lot of Hispanics

look alike.  Those four witnesses went on to become the identifying witnesses in this case.

Darden, Hall, Boyce and Woodard never identified Bermudez or his picture at any time.

53.    Mr. Bermudez's NYSIIS number was called into the Sixth Precinct, and the viewing of mug shots ended.

54.    The witnesses were not asked to look at any more than the limited number of mug shots they had looked at.  Detectives Lentini and Fiztpatrick put witnesses back in their car to take them to the Sixth Precinct.  The witnesses continued to talk among themselves in the squad car.

55.    On the way to the Sixth Precinct, the witnesses spotted the Pathfinder that had been involved in the incident parked on the street.  Detectives Lentini and Fitzpatrick decided to remain and investigate the Pathfinder, so they called a patrol car to take the witnesses back to the Sixth Precinct, surrendering all control and supervision of the eyewitnesses to unknown officers for the remainder of the trip back to the Sixth Precinct.

56.    Detectives Lentini and Fitzpatrick located the owner of the Pathfinder, Jose Rodriguez.  They took him to the precinct and his vehicle was impounded and dusted for fingerprints.

57.    The eight CATCH witnesses were taken back down to the Sixth Precinct, where their friends Angelo Maysonet and David Seiditch had apparently remained.  All ten witnesses remained in the precinct during the photo array procedure that followed, as did Jose Rodriguez, who was detained for questioning.

58.    Detective Massonova by this time had checked the police records of the persons whose mug shots had been chosen by the witnesses.  He now knew that Mr. Bermudez, age 22, had been arrested by federal agents six months earlier in a controlled buy of 4.7 ounces of

powder cocaine in the parking lot of the Cross County shopping mall in Yonkers, and was free on bail, awaiting proceedings on that charge.

59.    Detective Massonova now prepared four six-pack photo arrays, each showing front and side views.  The first (labeled #1 on Detective Massonova's Photo Array Report) contained the Fernando Bermudez shot, in the #2 position.  The second (labeled #2) contained the Efrain Lopez ("Shorty") mug shot, in the #3 position.  The third (labeled #3) contained the mug shot of Wilmer Rodriguez in the #4 position.  The fourth (labeled #4) contained a photo of Jose Rodriguez in the #2 position.

60.    Detective Massonova did not prepare a photo array containing the mug shot of Robert Ortega, whose face is confusedly similar to that of Wilmer Rodriguez and Fernando Bermudez.  Critically, the defense did not know about the Robert Ortega mug shot until April 2009.  The photo arrays of Wilmer Rodriguez and Fernando Bermudez, who have strikingly similar faces, were presented in an unusual fashion.  Both front and profile views were shown in these photos arrays, enabling witnesses to see that Wilmer Rodriguez had a ponytail.

61.    The ten victim-group witnesses watched TV and talked together as they waited to view photo arrays.  One by one they were taken into a room to view the photo arrays, and according to 2009 hearing testimony, they returned to the same room where the others were still waiting.

62.    Some of the witnesses testified in 2009 that during the photo array procedure itself that they had been urged by detectives to pay particular attention to the #2 picture (Fernando Bermudez) in that photo array

63.    Detective Massanova did not retain any contemporaneous notes he made of the results of the procedure. The notes he had prepared were turned over to ADA Rodriguez.  The

following is gleaned from his Photo Array Report, the Jose Rodriguez DD5, the witnesses' trial testimony, their post-trial statements and hearing testimony, and other documents.

64.    The same witnesses who had conferred with Jaime Velazquez over the Fernando Bermudez mug shot at the CATCH Unit (Okpa Iyesi, Frank Kent, and Michael Thompson) now identified Mr. Bermudez's mug shot out of the photo array.  The other witnesses (those who had not seen the photo before) did not select Mr. Bermudez's mug shot from the photo array as a picture of the shooter. This included Darden, Hall nor Boyce as well as David Seiditch and Angelo Maysonet, who had not gone to the CATCH Unit at all.

65.    Seven witnesses, including Angelo Maysonet, who had not gone to the CATCH Unit, identified the mug shot of Efrain Lopez, which Lawrence Darden had pulled out of the mug drawers identifying "Shorty", as the person who had been struck in the eye by Raymond Blount and had later pointed Raymond out to the shooter.

66.    Five witnesses identified Wilmer Rodriguez as a person present at the scene and as a member of the assailant group.

67.    David Seiditch and Angelo Maysonet identified the owner of the Pathfinder, Jose Rodriguez, one of them saying, according to the Report, "That's Jose, the one outside of the car."

68.    Jose Rodriguez was still in the precinct, and he was too was shown the photo arrays.  During his interview with Detective Massonova he claimed that he and his two friends "Mellow" and Manuel Vasquez, nicknamed Spanky, had observed the two hostile groups leave the Marc Ballroom, and had trailed them to watch the anticipated fight.  He gave his address and that of Manuel Vasquez, both in the Chelsea area of Manhattan, but claimed he did not know "Mellow's" real name and address.

69.     The Jose Rodriguez DD5 shows that he identified no one out of the photo arrays. Notwithstanding the fact Rodriquez failed to identify the plaintiff, Detective Massanova's Photo Array Report, and all of his testimony relying upon it, asserted that Jose Rodriguez identified Plaintiff.   Detective Massanova's photo array report is but one example of the defendants' falsification of documents.

70.     Jose Rodriguez was not charged in the incident.   His Pathfinder, however, remained impounded for many months thereafter.

71.     Later on August 5, 1991 Detective Massanova and other homicide detectives from the Sixth Precinct found Efrain "Pito" Lopez sitting with friends in the schoolyard of P.S. 84, behind his grandmother's building, the public housing project at 74 West 92nd Street. Lopez accompanied the officers to their car, was taken to the Sixth Precinct, and was "Mirandized" and questioned for hours, mainly by Detective Daniel Massonova and Detective Sergeant John Mulalley.

72.     At first, Lopez denied that he had been at the Marc Ballroom at all.  However, his face was still swollen from being struck by Blount, and he had been identified by numerous witnesses as the person who had been punched by Blount, who had then sat smoldering over the incident with his male and female friends, and who had later pointed Blount out to the shooter just before the fatal shot.

73.     Lopez was liable for murder or manslaughter, having acted in concert with the shooter.  Detectives told Lopez he could be facing 8-15 years in prison.  Lopez tried various stories before he finally got to one which the detectives could accept as plausible.

74.     Finally, he admitted that he had indeed been at the Marc Ballroom with "Anthony and 4 girls," that he was indeed the person some people called "Shorty" and that he had been

struck by Blount.  An hour later, he was admitting that outside the Marc Ballroom he had pointed

Blount out to the shooter, but claimed that the shooter was one of the three random males in the

Marc Ballroom who had asked him what had happened after the fight, even though they did not

know him.

75.    That ploy, too, was rejected.  The shooting had clearly taken place in retaliation

for the assault on Lopez, and the detectives were, therefore, looking for an "associate" of

Lopez's, someone he knew.  At around 10:15 p.m., Lopez was revealing that he knew two of the

girls he had been with at the Marc Ballroom from a project in his neighborhood, at 201 West 93rd

Street.  Then, at around the same time, Lopez revealed that the shooter was a drug dealer from

his neighborhood.

76.    Shortly thereafter, at around 11:00 p.m., Detective Massanova showed Lopez the

photo array with the Bermudez mug shot.  Detectives Massanova and Mulalley improperly

suggested to Lopez that Bermudez was the shooter.  Detectives then reminded him that he could

face many years in prison for the homicide, whether on a manslaughter or murder charge.  Not

wanting to be charged in the homicide, Lopez picked the mug shot that the detectives wanted

him to pick - the Bermudez mug shot.  All the information he gave about the shooter, however,

both before and after that identification, was completely inconsistent with Mr. Bermudez and

pointed to someone else entirely.  Over the next few hours, Lopez wrote out three statements in

which he described the shooter as a person he knew from in and around his grandmother's

building on West 92nd Street, whose street name was "Wool Lou" (his spelling).   Lopez, having

made these written statements, was still not free to leave.

77.    A few hours later, at around 3:00 a.m. on Tuesday, August 6. 1991, detectives

arrested Mr. Bermudez on is arrival home, where he lived with his parents on West 204th Street.

This is the Inwood section of northern Manhattan, over five miles from Lopez's schoolyard hangout on West 92nd Street.

78.     At around 11:00 a.m. on Tuesday, August 6, 1991, Mr. Bermudez was put in a lineup and he chose the number two spot, which was coincidentally the same place where his photo had been placed in the photo array.  At 6'1" and approximately 215 lbs., Mr. Bermudez was taller and heavier than the "collective description" given of the shooter back at the CATCH Unit (5"11", 165 lbs.), and was the tallest person in the lineup.  To minimize the appearance of height and weight, the participants were directed to remain seated.

79.     Only witnesses who had gone to the CATCH Unit were asked to return to the precinct to view the lineup. Once again, the witnesses congregated with one another both before and after the lineup.  After the first person viewed the lineup and came back, those who had not yet viewed the lineup were aware of which number others had chosen.

80.     The prior suggestive identification procedures obviously tainted the identification of the plaintiff at the line up.  As one would expect, as the result of a tainted photo array, the four stranger-on-stranger eyewitnesses who had conferred over the Bermudez mug shot at the CATCH Unit (Jaime Velazquez, Okpa Iyesi, Frank Kent and Michael Thompson) and who had then chosen his mug shot from the photo array back at the precinct (Iyesi, Thompson and Kent) proceeded to identify Bermudez from the lineup as the shooter.  Conversely, the three witnesses who had *not* conferred over the Bermudez mug shot at the CATCH Unit (the victim's good friends Lawrence Darden, Nkosi Boyce and Terrence Hall) did *not* identify Bermudez from the lineup.  Those witnesses were sure that Mr. Bermudez was too big and tall to be the shooter.

81.    During the lineup procedure, detectives pressed those who did not identify Mr. Bermudez to identify #2, and were particularly insistent with witnesses who had identified the mug shot but who were now expressing doubts, for example, Michael Thompson.

82.    Assistant District Attorney James Rodriguez was assigned to investigate the Blount homicide. He had investigated over fifty homicide cases between 1984 and 1992. DANY assistants' responsibilities included working with the New York City Police Department in investigating homicides. Pre-arrest, ADA Rodriquez was functioning as an investigator rather than an advocate of the Court. Therefore, ADA Rodriquez during the investigation are not protected by prosecutorial immunity. Rather ADA Rodriquez is afforded qualified immunity, as the other defendants, while he engaged in pre-arrest activities, in an investigatory capacity.

83.    ADA Rodriquez arrived at the Sixth Precinct at around 10:00 a.m., August 6, 1991, before the lineup was held. ADA Rodriquez was briefed by the named defendants as to the status of the homicide investigation. He conferred with the other named defendants and participated in the tainted line-up. Thereafter, he interviewed all the lineup witnesses and gave Michael Thompson and Jaime Velazquez subpoenas to appear at the grand jury two days later.

84.    In the meantime, Mr. Bermudez waived his *Miranda* rights and spoke extensively with Detective Massanova and possibly other named or unnamed defendants, providing an account of his night out with his friends on Saturday to Sunday, August 3-4, and denying knowledge of or participation in a homicide. He told Detective Massanova that he had taken an entrance exam at Bronx Community College on the Saturday morning and returned home, had later gone with several friends to pick up his father's car from the body shop at around 6:00 p.m., and had later driven around the Bronx and Manhattan with three friends all night, arriving home early Sunday morning.

85.    While Mr. Bermudez was being questioned, Mr. Bermudez's mother had told his friends Leonard Macaluso and Euclides Santana, who had been with him during the entire preceding Saturday night, of his arrest in connection with events that the police said had occurred on that night.  Mr. Macaluso and Mr. Santana accompanied Mrs. Bermudez to the Sixth Precinct, where all three spent the day, speaking with Detective Massanova and other named defendants, and whom independently corroborating Mr. Bermudez's account of how he had spent the previous Saturday and early Sunday.  ADA Rodriquez was aware of all the foregoing facts.

86.    In fact, at around 5:00 p.m., ADA Rodriguez did a videotaped interview of Mr. Bermudez together with Detective Massanova.  Mr. Bermudez once again waived his Miranda rights and told ADA Rodriguez and Detective Massanova that he had no knowledge of the Marc Ballroom incident whatsoever.

87.    ADA Rodriguez, knowing that the shooter and Lopez had been described by witnesses as friends and associates, told Mr. Bermudez that "Shorty," or "Efrain Lopez," had identified him.  Mr. Bermudez showed an utter lack of knowledge of anyone called "Shorty," or "Efrain Lopez."  ADA Rodriguez tried to get Mr. Bermudez to inculpate Lopez by saying that if he did not do so, Mr. Bermudez would be the only person punished for a homicide for which "Shorty" was largely to blame: "So Shorty asked you to do something to help him get this guy……Now's the time to tell the truth….Shorty's going to walk out of here and you're going to take the fall because he got into trouble wit a guy."

88.    Mr. Bermudez utterly denied knowing any such person or having participated in any such incident.  Once again, he described his doings of the Saturday night of August 3-4, when he and his friends had gone to a body shop to pick up his father's car, a BMW which had been bought in a crashed condition and had later driven around Manhattan with three friends

(Leonard Macaluso and Euclides Santana who were from his neighborhood around West 204th Street and Rick Ramirez from the Bronx) until the early hours of the morning.

89.    The friends had indeed been in Greenwich Village at one point in the early morning hours (as close to the Marc Ballroom as the BBQ Restaurant at 8th Street and University Place) but they had not been at or in front of the Marc Ballroom.  They had been eating at the BBQ Restaurant at around 2:00 a.m. or so, and had been rushed because the restaurant was closing, had then gone to the South Street Seaport, then back uptown.

90.    As early as August 6, 1991, ADA Rodriguez, acting in his investigatory capacity along with Detective Massanova and other named defendants had credible evidence from various independent sources that Mr. Bermundez had an iron clad alibi and could not have possibly been at the crime scene on the date and time of the murder.

91.    About an hour after this, around 7:00 p.m. on August 6, 1991, ADA Rodriguez, together with Detective Massanova, did a videotaped interview of Lopez, who was still being held at the Sixth Precinct.  This was the first time ADA Rodriguez had spoken to Lopez but he already knew about Lopez's photo identification of the Bermudez mug shot the night before. ADA Rodriguez also knew that Mr. Bermudez has a Federal cocaine charge pending.  ADA Rodriguez read Lopez his *Miranda* rights and Lopez described how the victim in this case, Blount, had punched him, how bouncers had taken him and Blount up to the street to "squash that", how he had come back inside and called his grandmother, and how the shooter, a guy whom he knew from "around his way," had "approached him" and asked what had happened, and later asked Lopez to point Blount out to him, which he had done.

92.    Of the shooter, Lopez said, "He hangs around my grandmother's block.  I know him."  Asked what "relationship" he had with him, Lopez said, "There was no relationship, but I

knew his name.  His name was Lou."  ADA Rodriguez, surprised, asked: *"Lou?"* Lopez answered: "Yeah.  They used to call him 'Wool' Lou," because he sold crack "wools," (which was a mixture of crack and marijuana."

93.    Lopez referred to the shooter as "Lou" on three occasions.  ADA Rodriguez and Detective Massanova knowing full well that Mr. Bermudez's name was not Lou, made clear to Lopez that he should call the shooter by the nickname "*Woo*lu" (pronounced to obscure the name Lou) instead.  Both ADA Rodriguez and Detective Massanova interrupted Lopez at one point to correct him to say "Wool Lou," pronounced "*Woo*lu."

94.    Lopez made clear that Wool Lou was a denizen of Lopez's grandmother's building and was "always" in the schoolyard of P.S. 84, on West 92nd Street, where Wool Lou had a "drug business," and where "everybody" hung out in the summer.  Lopez also told ADA Rodriguez and Detective Massanova that Wool Lou had been in the schoolyard, at around 6:00 p.m. the previous Saturday, hours before the shooting.  In addition, Lopez,  when asked about the shooter's facial hair, clearly stated that Wool Lou had no facial hair.

95.    ADA Rodriguez clearly taken aback by the numerous details about the shooter given by Lopez which did not fit Mr. Bermudez, had Detective Massanova bring the photo array into the room.  Lopez confirmed the identification he had made of the Bermudez mug shot the night before as the picture of "Wool Lou," except "he didn't have none of that hair on his face."

96.    ADA Rodriguez asked Detective Massanova if this was the same photo array as the one that had been shown to Lopez the night before, and Detective Massanova replied: "And all other witnesses."  At this point in the interview, ADA Rodriguez and Detective Massanova made it clear to Lopez that the other witnesses had identified the plaintiff as the shooter.

97.    Still, Lopez, continued to elaborate to provide many names and details about the young people in his neighborhood, sufficient to find and arrest the West 92nd Street playground crack dealer known in the neighborhood as "Wool Lou," as well as to find other witnesses to, and participants in, the crime – other members of Lopez's neighborhood crowd who had been down at the Marc Ballroom on August 3-4 (such as "Lisa", "Maritza or Maria," "Anthony," "Coco," "Mikey," and "everybody" who "hung out" in the schoolyard of P.S. 84).

98.    ADA Rodriguez and Detective Massanova made it very clear to Lopez that he was still in jeopardy, telling him late in the interview: "Now, **we** have some information, and, people overheard you talking about getting somebody to take care of this guy." Lopez responded that he had merely thought that "they" were going to beat Blount up.

99.    As a result of this interview with Lopez, the following facts became clear:

   a.    the shooter's name was Lou, not Fernando;

   b.    Wool Lou was a personal friend of Lopez;

   c.    the shooter had no facial hair;

   d.    the shooter was a regular in Lopez's neighborhood;

   e.    the shooter was a drug dealer at the West 92nd Street playground; and

   f.    there were many avenues available to the police to determine the identify or existence of Lou.

100.    Despite knowledge of these critical facts, Lopez was allowed to leave the precinct. Thereafter, having learned these significant facts, ADA Rodriguez, Detective Massanova and possibly other defendants conferred and agreed not to pursue any of the evidence provided by Lopez as to the true identification of the shooter. Detective Massanova took Lopez back to his Grandmother's house on West 92nd Street.

101.    ADA Rodriquez and Detective Massanova did not ask Lopez to help him locate Wool Lou or anyone else who had been involved in the crime or might have witnessed it. No attempt was ever made to find "Maritza/ Maria", "Lisa", or "the other two girls", or "Anthony", or "Coco", or "Mikey". No investigation of the person known in the neighborhood as Wool Lou, or any of the West 92nd Street schoolyard crowd was ever done by defendant. Finally, after the plaintiff's arrest, ADA Rodriquez and other named defendants agreed not to disclose all the foregoing information identifying the real shooter to the grand jury, the defendant his counsel defense, the Hearing court, the trial court and the appellate court until disclosure became an impossible avenue. (to pursue these facts would have undermined their already tainted ids of Bermudez.)

102.    It was not until years after the defendant was convicted that there was any attempt to even find Wool Lou (Louis Munoz) to justify this aberration. An effort which ultimately backfired.

103.    ADA Rodriquez and Detective Massanova then conducted lengthy interviews with Leonard Macaluso and Euclides Santana, who had been at the Sixth Precinct all day, providing Detective Massanova with oral and written statements about their Saturday night out with Mr. Bermudez. They now consented to be questioned by ADA Rodriquez on video tape, and endured close questioning.

104.    Mr. Macaluso was pressed particularly hard. The questions put to him demonstrated that he was not believed, and included hints that he could potentially be identified by witnesses in connection with the crime. Both Mr. Santana and Mr. Macaluso remained steadfast in their accounts, which largely dovetailed with Mr. Bermudez's account except in minor details.

105.    Detective Massanova, ADA Rodriquez and other defendants actively conspired to suppress the actual events of the night in question, including but not limited to, the suppression of the exculpatory witness statements and the suppression of the exculpatory evidence logically flowing therefrom.

106.    The defendant police officers also conspired with ADA Rodriquez and Lopez to permit him to testify falsely and allow materially false, unconstitutional and tainted evidence to be presented at the grand jury, pretrial, hearing and trial stages of the proceedings all against plaintiff's State and Federal constitutional protections.    These actions taken by Lopez were done with the assistance of the defendants' at the expense of MR. BERMUDEZ rights.  All of this manufactured for the specific purpose of convicting MR. BERMUDEZ of the Blount murder despite his innocence and the fact he lacked any connection to the Marc Ballroom or the murder of Blount.

107.    Despite all the evidence that had emerged from the investigation pointing to the guilt of an associate of Lopez's named Lou, defendants intentionally elected not to pursue the exculpatory evidence. Instead, defendants intentionally hid exculpatory evidence establishing innocence and the fact the shooter was someone other than plaintiff.  Thereafter, the defendants fabricated evidence, testimony, and documents which were ultimately utilized in support of plaintiff's arrest, prosecution and all post conviction proceedings.

108.    Two days later, on Thursday, August 8, 1991, Jamie Velazquez and Michael Thompson testified to their identification of Fernando Bermudez before the grand jury. Defendants intentionally elected not to call Lopez as a witness to the Grand Jury.  Fernando Bermudez was indicted for the murder of Raymond Blount. Mr. Bermudez was never notified of the grand jury proceeding.

**Pre-Wade events**

109.    Mr. Bermudez's parents immediately retained Barry Kenyon, Esq., to represent him on the murder charge. Mr. Kenyon was unaware of what had gone on at the Sixth Precinct on August 6.

110.    One week after the grand jury, ADA Rodriguez provided to Mr. Kenyon a People's Voluntary Disclosure Form (PVDF), which erroneously claimed that six people had identified Mr. Bermudez's mug shot out of a photo array and that four people had not identified it.

111.    In fact, the numbers were five mug shot identifiers versus five non-identifiers and one of the identifiers was in reality a co-participant in the homicide who, while under threat of prosecution, had identified the shooter in a videotaped interview as a neighborhood associate of his named Lou, nick named "Wool Lou", who "didn't have none of that hair on his face."

112.    The PVDF made no mention of Lopez's statements or his videotaped interview.

113.    The PVDF also did not mention that two other people who had played a role in the crime (i.e., the occupants of the Pathfinder, who had cut of the victim group after talking to the shooter outside the Marc Ballroom) had not identified Mr. Bermudez.

114.    The PVDF did not mention that witnesses had chosen two other similar-looking mug shots as members of the assailant group and suspects in the crime (Wilmer Rodriquez, and Robert Ortega) and that all the chosen mug shots presented a confusedly similar Hispanic face, with a prominent "fade" style haircut, corresponding to witness descriptions.

115.    The PVDF did not mention that descriptions of the shooter were of a considerably shorter and slighter person than Mr. Bermudez.

116.    The PVDF did not mention that Mr. Bermudez and his friends Mr. Santana and Mr. Macaluso had all made videotape statements providing exculpatory, detailing accounts of their night out together-with regard to times, all saying that when they had been eating at the BBQ, it was closing time. Detective Massanova was aware that the BBQ restaurant closed at 2:00 a.m., and had stated as much to Mr. Macaluso, on videotape, in ADA Rodriquez's presence.

117.    The "Brady" box on the PVDF was left unchecked, misleading defense counsel into thinking that the District Attorney was not in possession of any exculpatory information. In response to request counsel's request for "Brady" material in his omnibus motion, ADA Rodriquez referred defense counsel to the PVDF.

118.    New York and Federal law guides and exhorts law enforcement personnel to disclose exculpatory information as soon as possible, to enable defendants to investigate and develop a defense.

119.    In the instant action, the defendants failed to disclose any exculpatory information until the eve of trial and classified obvious "Brady" material as "Rosario" material.    The defendants knew the untimely disclosure of the exculpatory evidence to the defense would impair their ability to successfully litigate during motion practice and the pretrial hearing stages as well as the ultimate trial itself.

**The *Wade* Hearing**

120.    ADA Rodriguez consented to a *Wade* hearing as to all the witnesses, without revealing to Mr. Kenyon that one of the "identifying" witnesses was a co-participant in the crime who knew the shooter from a long association in his own neighborhood.

121.    Justice John A.K. Bradley presided over the *Wade* hearing on December 20, 1991.

122.    At the *Wade* hearing, Detective Lentini falsely testified amongst other things about an orderly, well-supervised procedure at the CATCH Unit. He himself had walked in and out of the room, but he testified that detective Fitzpatrick had remained in the room supervising the witnesses during the entire viewing procedure and that the witnesses had had no opportunity to confer with one another or look over one another's shoulder at mug shots.

123.    Detective Massanova falsely testified amongst other things that at the Sixth Precinct the witnesses had been kept separate before and after the photo array procedure, and that the identifying witnesses had made independent identifications of Mr. Bermudez's mug shot under no pressure whatsoever.

124.    He further falsely testified that, during the line up procedure two days later, the witnesses had been kept separate before and after the line up, and that the identifying witnesses had made independent corporeal identifications of Mr. Bermudez, under no pressure from police whatsoever.

125.    The impression created by this false testimony was that the identifying witnesses had made independent, untainted, unhesitant, uncoerced, and confident identifications of Mr. Bermudez.

126.    Significantly Detective Massanova also testified falsely that Jose Rodriquez, who had been questioned on August 4th in connection with the crime because he owned the Pathfinder which had played a part in the incident, and had been present at the shooting, had identified Mr. Bermudez. In fact, Detective Massanova's DD5 concerning his interview with Jose Rodriquez clearly states Rodriquez failed to identify anyone.

127.    Defense counsel, Mr. Kenyon, upon hearing detective Massanova's testimony regarding the photo array identification of Mr. Bermudez by someone called "Efrain Lopez",

attempted to make inquiry as to why "Efrain Lopez" had not viewed the corporeal lineup. ADA Rodriguez successfully objected, once again concealing exculpatory information prior to trial.

128.    Mr. Kenyon, upon hearing Detective Massanova's testimony regarding the witnesses' identifications of one of the mug shot as "Shorty," also attempted to make inquiry as to who "Shorty" was, and whether the police had identified him. ADA Rodriguez successfully objected, once again concealing exculpatory information prior to trial.

129.    Thus, despite defense counsel's specific request for information about "Shorty" and "Efrain Lopez," this person was held out by ADA Rodriguez at the *Wade* hearing as two different persons-one of them, Efrain Lopez, a mere eyewitness who had participated in a non-suggestive photo array identification; the other, "Shorty" who (as shown on the Photo Array Report) had been identified as the kid who was hit by Blount and who pointed out Blount to the shooter.

130.    Detective Massanova specifically tailored his testimony to conceal the disclosure of this critical Brady material from the court and defense.

131.    The result of these acts of concealment and deception by the defendants and ADA Rodriguez post-arrest as part of the conspiracy, during and after the *Wade* hearing, precluded the defense from learning that Lopez had identified the shooter as a person named Lou, nicknamed Wool Lou, and not the plaintiff.   The conspirators' actions further prevented the court and defense from discovering the tainted identification procedures that took place pre-arrest.

132.    Based upon the false testimony given by Detectives Lentini and Massanova, and which was solicited by and acquiesced to by ADA Rodriguez, Justice Bradley found that the pre-arrest identification procedures were Constitutionally sound (not unduly suggestive) and denied the motion to suppress the lineup and in-court identifications.  By these overt acts, the defendants

achieved one of their conspiratorial goals, that being the suppression of the unduly suggestive pre-trial identification procedures.

133.    In Mid-December, Lopez was incarcerated, having absconded from his work-release program. The defendants had Lopez produced in the District Attorney's office. Thereafter, the defendants along with Lopez, conspired with each other, reaching an understanding that if Lopez testified against the plaintiff, thereby ignoring the truth, he would be the benefactor of a cooperation agreement and would not face prosecution for the Blount homicide.

134.    In early January, in furtherance of the conspiracy, still having disclosed nothing whatsoever to Mr. Kenyon about Efrain Lopez, ADA Rodriquez made an ex-parte application to Justice Bradley to assign a lawyer to represent Lopez for the purpose of signing the aforementioned cooperation agreement.

135.    On January 14, 1992, two days before jury selection, Defendants again had Lopez brought to the District Attorney's office from prison, where he met with his court-appointed attorney, Eric Schlosser, and signed a cooperation agreement, according to which he would not be charged with the murder of Blount, if he testified against Fernando Bermudez.

136.    During these meetings with the defendant(s) at the D.A. 's office, Lopez revealed more facts about his neighborhood and Wool Lou, telling the defendants that his neighborhood friends "Anthony Steward," who had been at the Marc Ballroom, and "Wilfredo Maldonado" both knew Wool Lou. Notwithstanding this, defendant(s), consistent with the conspiratorial motive, continued to prepare Lopez to testify falsely.  Namely, the defendants stressed that "Wool Lou" was to become "Woolu", that he barely knew "Woolu", to deny that he had seen

"Woolu" in his grandmother's building, and to imply that "Woolu", did not live in Lopez's neighborhood, facts that all of the defendants knew were false.

137. Defendants also directed Lopez to identify the defendant (Bermudez) at counsel table as "Woolu," and under no circumstances was to reference the shooter as Lou or that he knew the shooter's real name.

138. The New York County District Attorney's Office and the New York City Police Department are separate entities who have the ability to conspire with each other.

139. The defendant police officers and the Assistant District Attorney withheld facts and evidence from the Grand Jury and petit jury, including but not limited to, withholding facts of the suggestive and coercive identification procedures, suppressing the details of Lopez's perjurious testimony, and suppressing exculpatory evidence.

140. Conversely, the ADA presented evidence in the light most favorable to his co-conspirators including the presentation of evidence specifically designed to give credit to the conspirator's fabricated version of events.

141. The defendants manipulated the the grand jury presentation in part by:

(a) Meeting and preparing the witnesses,

(b) Manipulating the evidence to conform with the contrived facts offered by the co-conspirators,

(c) Excluding specific evidence that corroborated MR. BERMUDEZ innocence and discredited Mr. Lopez's version from the Grand Jurors attention and petit jurors attention

142. All of this was done with the conspiratorial goal of convicting MR. BERMUDEZ.

**The Trial**

143.    The voir dire was held on Thursday, January 17, and Friday, January 18, 1992. ADA Rodriguez waited until the jury had been empanelled, on the Friday afternoon, four days before opening statements, to provide Mr. Kenyon what was purportedly mere "*Rosario*" material (accompanied by a list entitled "Trial *Rosario* List")-- again, without indicating in any fashion that the materials he was handing over contained anything exculpatory.

144.    This voluminous material included the Lopez handwritten statements and the Lopez videotape, but no transcript of it. It also included the Jose Rodriguez DD5, which reflected the fact that Jose Rodriguez had not identified anyone, contrary to Detective Massanova's *Wade* testimony.

145.    The material did not include the videotapes of the interviews which ADA Rodriguez had done of Mr. Macaluso or Mr. Santana. The material also did not include any information about the Robert Ortega mug shot.

146.    The trial began on Tuesday, January 21, 1992. On Thursday, January 23, the first identifying eyewitness, Okpa Iyesi, spontaneously testified that he had looked over Lawrence Darden's shoulder at Efrain "Shorty" Lopez's mug shot at the CATCH Unit and exclaimed, "That's him," and Darden had answered, "I know". This flatly contradicted Detective Lentini's *Wade* testimony about a closely supervised, silent viewing of mug shots. Neither defense counsel nor ADA Rodriguez moved to reopen the Wade hearing.

147.    ADA Rodriguez had the stranger-on-stranger eyewitnesses Okpa Iyesi, Jamie Velazquez, Frank Kent and Michael Thompson testify to what they had seen during the crime, including the fact that Lopez had pointed Blount out to the shooter, whereupon the shooter had

shot Blount. These witnesses also testified to having picked Mr. Bermudez out of a lineup, separately, one by one, as the person they had seen with the gun.

148.    The presentation made the jury think that these had been four completely independent lineup identifications, free of taint, and thus mutually corroborative, when in fact they had all taken place as a result of the joint viewing of the Bermudez mug shot at the CATCH Unit and as the result of other suggestive and coercive influences.

149.    The witnesses were then of course asked to identify Mr. Bermudez in the courtroom. In their descriptions of the shooter, they were clearly describing not the shooter, but Mr. Bermudez's mug shot.

150.    ADA Rodriguez called Efrain "Shorty" Lopez, on Tuesday, January 28. Lopez admitted that, as other witnesses testified, he had pointed Blount out to the shooter at the intersection of 13th Street and University, whereupon the shooter had shot Blount.

151.    Lopez identified Mr. Bermudez in the court as the shooter, "Woolu".

152.    Consistent with the conspiracy, ADA Rodriguez elicited inaccuracies from Lopez aimed at creating the impression that Wool Lou was a fleeting and largely unknown presence in Lopez's grandmother's neighborhood, that Lopez barely knew "Woolu" and did not know his "real" name, and that Lopez had not been in the Marc Ballroom with other people who also knew Wool Lou.

153.    ADA Rodriguez also successfully opposed Mr. Kenyon's application to play the Lopez videotape for the jury, and did not make his transcript of the Lopez videotape available to Mr. Kenyon.

154.    In furtherance of the conspiracy, ADA Rodriguez told the jury that Lopez had not been chargeable in the Blount homicide, and that he had not participated in any pretrial

identification procedure, but had provided "leads" about the shooter which had independently corroborated the eyewitnesses' identification of Bermudez.

155.    The victim's best friends, Darden, Boyce and Hall, all testified for the defense, saying that they had not identified Mr. Bermudez at any time.

156.    Mr. Bermudez, Mr. Santana, and Mr. Macaluso all testified in accord with their prior videotaped statements. At some point during the trial, Mr. Kenyon became aware that Mr. Lopez had said he had seen Wool Lou together with his other friends in the schoolyard at 6:00 p.m. before going downtown to the Marc Ballroom. Mr. Kenyon then obtained the appearance of yet another of Mr. Bermudez's friends, Adelso Suarez, who testified that, as Fernando and his other friends had stated in detail during their videotaped statements  and at trial, at 6:00 p.m. that Saturday, they had been picking Fernando's car up at the body shop. Another witness, Nelson Aquavivas, testified that he had seen Mr. Bermudez and his friends in the car in Washington Heights at 3:00 a.m.

157.    There was no physical or forensic evidence connecting Mr. Bermudez to the murder; his fingerprints did not correspond to any of the prints found on the Pathfinder; no gun was found, nor any clothes matching the witnesses' descriptions, nor any "Gucci" link with large medallion, which was also described by all witnesses, including Lopez. No association whatsoever was ever found between Mr. Bermudez and Efrain Lopez or his neighborhood or his friends.

158.    Based upon the foregoing improprieties, Mr. Bermudez was convicted by the jury on February 6, 1992 where he remained for approximately 18 years before his release

## The Post Trial Defense Investigation and CPL 330.10 Motion

159.    Late in the trial or soon after the verdict, Mr. Kenyon gave his investigator, Michael Gaynor, the information about the perpetrator, which had emerged during the trial, including the Lopez videotape. Lopez had admitted late in his cross-examination that Wool Lou was a "friend" whom he "knew well"; that he, Lopez had grown up with one Wilfredo Maldonado in the same building, 589 Amsterdam Avenue, and that Mr. Maldonado had "introduced" Lopez to Wool Lou.

160.    Lopez had also testified to the last name of Anthony Steward, who had been with Lopez at the Marc Ballroom, and who Lopez had said on the videotape also knew Wool Lou. Armed with this information, Mr. Gaynor within weeks found out who Wool Lou really was.

161.    On March 4, 1992, Mr. Gaynor called Detective Massanova on the telephone to tell him that Wool Lou was a friend of Lopez's named Luis Munoz, who had skipped town after the Blount homicide. He gave him the address and telephone number where Munoz had lived with his grandmother, 136 West 91st Street, Apt. 15K, together with another phone number. Detective Massanova assured Mr. Gaynor that he would look into this information. Detective Massanova never did follow up on this information.

162.    The relevant portion of that tape recorded conversation went as follows:

| | |
|---|---|
| Gaynor: | ...Let me ask you this. If ..if you had information that Wool Lou and Shorty was - that Shorty (who is really Pito, Efrain Lopez)... |
| Massanova: | Yeah, I know who he is |
| Gaynor: | ...had a friend that he knows for at least five years by the name of Wool Lou who is not Bermudez and that Wool Lou skipped town right after the homicide and is now in another state, would you be interested in following up on that. |
| Massanova: | Of course we would be. I mean we'd be negligent in not doing it, don't you think? (Defendant's Appendix C, Exh. 91, page 1). |
| Massanova: | Okay (Pause) Well, if you want to pass on this information, I'd be more than happy to look into it. (Pause) I mean, that's my job here. |

| | |
|---|---|
| Gaynor: | Well the guy's name is Munoz, M-U-N-O-Z. |
| Massanova: | hold on, let me get this down with a pen and paper. M-U- |
| Gaynor: | N-O-Z |
| Massanova: | N-O-Z |
| Gaynor: | Right. His first name is Luis. L-U-I-S, I believe, but it could be L-O-U-I-S. |
| Massanova: | Yeah. |
| Gaynor: | His address, his grandmother still lives there, at the time of the murder, was 136 West 91st Street, Apartment 15 K as in King. |
| Massanova: | Okay. |
| Massanova: | All right, well, I appreciate this bit of information, and I will make an inquiry to find out who this person is.  No doubt that I'll follow this up. But uh, the bottom line is, I mean, you know, you're working on an appeal here. Let's see what happens. And I gotta naturally run this by the assistant district attorney who's handling the case . |

163.    Mr. Kenyon filed a CPL 330.10 motion and sentencing was stayed. Over the following six months Mr. Gaynor conducted  numerous interviews and turned them over to Mr. Kenyon, who then turned over to the court, numerous affidavits and audiotapes of telephone conversations. Mr. Gaynor obtained the affidavits of four young women who had been with Lopez at the Marc Ballroom, who attested that Wool Lou was a friend of Lopez's named Luis Munoz, of 136 west 91st Street, who had left New York after the homicide. He also prepared an affidavit about his interview with Anthony Steward, who told Mr. Gaynor that he knew Wool Lou and had seen him at the Marc Ballroom.

164.    Mr. Gaynor prepared a six-pack photo array containing a photo of Fernando Bermudez and a photo of Luis Munoz. He interviewed Lawrence Darden and Nkosi Boyce in separate interviews. They were already both sure that Mr. Bermudez was not the right person, because they had seen in the lineup and in the courtroom that he was too big and tall. Mr. Darden had not seen the shooters face, so he made no identification of any photos. Mr. Boyce, however,

had seen the shooters face, and he indentified the Munoz photo as the one most similar to the shooter.

165.    Messrs. Darden and Boyce encouraged Mr. Gaynor to be in touch with the victim's mother to let her know what was going on. When Mr. Gaynor wrote Ms. Blount a respectful letter asking her for permission to speak with her, ADA Rodriguez told her not to speak with Mr. Gaynor, and defendants had her moved to another apartment.

166.    ADA Rodriguez himself apparently had independent reason based on his review of public records to bring crucial information about Munoz to the Court's attention. In November 2002, at the Federal habeas hearing, ADA Rodriguez testified:

> A     When the defense filed papers indicating their contention that Wool Lou Was Luis Munoz and he was a [*sic*; the?] real shooter, I ran a record check on Munoz. I believe he had a car theft record which was similar to Lopez's criminal history. **I surmised from that he might have misidentified the defendant by name only to mislead the police during the videotape interview I took of him.**

HT 761. Those public records shed light on Munoz's relationship to Lopez and his neighborhood.

167.    On June 13, 1990, Luis Munoz, age 20, of 136 West 91st Street had been arraigned on car theft charges with Lopez's half-brother, Johnny Cordero, age 19, of 74 West 92nd Street, and two other young men from projects in the same neighborhood, 100 West 92nd Street and 201 West 93rd Street. The latter building is the De Hostos Apartments, the "wild" project which Lopez had said was called "Vietnam"-where on the videotape Lopez had told ADA Rodriguez "everybody" hung out in the winter, and where "Lisa" and "Maritza" would "most likely" know Wool Lou because "he be around there."

168.    Thus, before the court entered judgment against Fernando Bermudez, Defendants knew that the defense team now realized that Lopez committed perjury, when he had identified

Mr. Bermudez at trial as Wool Lou, that Wool Lou was Lopez's and Johnny Cordero's friend Luis Munoz, and that this lie had resulted in plaintiff's conviction.

169.    Defendants also had reason to know (from the affidavits submitted by Mr. Kenyon) that Munoz himself was aware that he had been named as the shooter by Lopez and had evaded arrest by leaving the jurisdiction. Nonetheless, the defendants did nothing but perpetuate the fraud.

170.    On September 9, 1992, Justice Bradley, relying on ADA Rodriguez's papers, denied relief.

171.    On September 17, 1992, Mr. Gaynor interviewed the first identifying eyewitness who had testified at trial, Okpa Iyesi. Mr. Iyesi looked at Mr. Gaynor's six-pack photo array and identified the Luis Munoz photo as the one most resembling the shooter. He wrote out an unsworn statement to that effect, adding that he had described the shooter to Detective Massanova as "slim," which was in accord with the original descriptions of the shooter's build, and that he had indentified Mr. Bermudez in the seated lineup because of his "fade" haircut. He added: "My only concern is that the police and the District Attorney do not threaten me any way for telling the truth."

172.    On September 18, 1992, Justice Bradley sentenced Mr. Bermudez to 23 years to life in prison.

173.    On September 22, 1992, just four days after Mr. Bermudez was sentenced, Efrain Lopez signed an affidavit for Mr. Kenyon, finally acknowledging what he knew had been discovered by Mr. Gaynor: Wool Lou was Luis Munoz. Lopez also reaffirmed that Wool Lou/Luis Munoz was the shooter. Lopez alleged that he had been coerced into identifying the Bermudez mug shot by the threat of being prosecuted in the Blount homicide.

**Post-sentencing Litigation**

174.    Soon thereafter, Mr. Kenyon turned his file over to appellate counsel. Post-conviction attorney Mary Ann Di Bari obtained a stay of the direct appeal and prepared a CPL 440.10 motion on the basis of her conversations with numerous witnesses.

175.    The identifying witnesses signed affidavits withdrawing their identifications and alleging that they had conferred over the Bermudez mug shot at the CATCH Unit and agreed that he resembled the shooter. They also alleged that they had been subjected to various forms of pressure by Defendants to persuade them to identify Mr. Bermudez in court with more confidence than they had really felt.

176.    Ms. Di Bari submitted a number of motions, claims, papers, and exhibits over the next few years, which included additional affidavits demonstrating that Wool Lou was Lopez's good friend Luis Munoz.

177.    ADA Rodriguez's opposition to relief for Mr. Bermudez was strident and deceptive. ADA Rodriguez felt free to make numerous gross misrepresentations of fact to court. Denying all allegations of suggestive procedures at the CATCH Unit, he failed to mention to the court that Mr. Iyesi's trial testimony had been made clear that witnesses had been looking over one another's shoulders at the CATCH Unit (testimony which ADA Rodriguez was aware of, since he cited to the pertinent transcript pages for his own purposes).

178.    ADA Rodriguez also claimed that Darden and Boyce's post-trial affidavits were false, based on his own false statements regarding what Messes. Darden and Boyce had said in their affidavits and in their trial testimony.

179.    Ironically, ADA Rodriguez alleged that all of the post-trial affidavits were the result of defense misconduct.

180.    He dredged up the Bermudez family's emotional behavior during and after trial to shore up his otherwise baseless claims of "overreaching" and worse by Mr. Gaynor and Ms. Di Bari.

181.    Finally, with regard to the central fact of the case, i.e., that Lopez, the co-participant in the crime, had identified the shooter as a friend of his, Wool Lou, Luis Munoz, and had falsely identified Mr. Bermudez as that person, ADA Rodriguez simply ignored this, even when an affidavit by a member of the schoolyard crowd, Wilfredo Maldonado, provided many names of those who had been gathering in the schoolyard to go to the Marc Ballroom, including Lopez, Munoz, and Spencer Rivera, and attested that Mr. Bermudez was a person who was completely unknown to this crowd of people.

182.    Justice Bradley, relying on ADA Rodriguez's misrepresentations, uniformly denied a hearing on all claims, and issued several written decisions denying relief from 1995 to 1997.

183.    Relying on the record created by ADA Rodriquez, the other named defendants and co-conspirator Lopez, the DANY continued to make the same misrepresentations of fact to the Appellate Division as defendants had in all the lower court proceedings. The defendants knew that the natural consequence of this fact would result in the continued deprivation of plaintiff's constitutional rights and his wrongful and unjust incarceration for a murder he did not commit.   For example, the post-trial statements were attacked as the result of defense misconduct. The Iyesi trial testimony regarding suggestive procedures was not revealed to the Court. It was falsely alleged that Mr. Boyce had testified that he had not seen the shooter's face and that therefore Mr. Boyce's post-trial statement identifying the Munoz mug shot was the result of defense misconduct, such as threats, bribes, and harassment. Lopez was deceptively

played to the court as an innocent bystander in the Blount homicide, despite all the evidence against him.

184.    In addition to all this, the DANY now began a strategy of asserting outright that Lopez had known Mr. Bermudez as "Wool Lou". This had been the People's theory at trial, but, as recited above, his theory had already been debunked in 1992 when the undisputed evidence demonstrating its falsity had been presented to the court in the CPL 330.10 motion.

185.    DANY Appellate counsel even went so far as to claim that this perjurious testimony "standing alone, sufficed to warrant the jury's verdict". On October 23, 1997, the Appellate Division, relying on that (and numerous other misrepresentations by the DANY regarding alleged misconduct by the defense post-conviction team), denied Mr. Bermudez's appeal.

186.    New counsel brought another CPL 440.10 motion and a motion for a writ of coram nobis in 1999, presented in pro forma fashion in preparation for filing a petition for a Federal writ of habeas corpus. They were summarily denied on procedural grounds.

187.    The petition for habeas corpus was filed in the Southern District of New York in June 2000. The DANY responded as it had done before the Appellate Division, once again deceptively painting the uncharged co-participant in this homicide, Efrain Lopez, as in innocent bystander, which was patently false on the trial record, and who had known Mr. Bermudez as "Wool Lou," as to which, as recited above, the undisputed evidence showing its falsity had been presented to the trial court in 1992.

188.    Federal Magistrate Judge Kevin Nathaniel Fox held a hearing into the claims of suggestive identification procedures and perjury in November 2002. He heard testimony from the eyewitnesses as well as from Lopez, his friend Wilfredo Maldonado, Detective Lentini,

Justice Bradley and ADA Rodriguez. The eyewitnesses recounted the suggestive and coercive procedures at the CATCH Unit and at the Sixth Precinct. The identifying eyewitnesses steadfastly withdrew their identification of Mr. Bermudez. They were closely cross-examined on the friendly relationships they had developed with Ms. Di Bari over the years.

189.   ADA Rodriguez revealed in his Federal habeas testimony, for the first time, that when the defense had alleged that Wool Lou was Louis Munoz, he had checked Louis Munoz's criminal record, had seen that he had a record similar to Lopez's, and had "surmised from that that he might have misidentified the defendant by name only to mislead the police during the videotape interview I took of him."

190.   Despite ADA Rodriguez's testimony, and despite the testimony of Wilfredo Maldonado corroborating that Lopez's good friend Wool Lou was in fact Louis Munoz, and that the schoolyard crowd gathering to go to the Marc Ballroom had including both Lopez and Louis Munoz, the DANY continued to oppose relief, repeating yet again to the Federal District Court what where now outright, demonstrable falsehoods; that Lopez had not been chargeable in the crime; that Lopez had known Mr. Bermudez as "Wool Lou"; and that there was "no basis" to believe that Lopez had committed perjury at trial. The DANY made many other misstatements of fact.

191.   In March 2004, the Magistrate issued his Report and Recommendation finding that detectives had in fact been in and out of the CATCH Unit, leaving witnesses unsupervised, and that the four eyewitnesses had jointly viewed and conferred over the Bermudez mug shot.

192.   Nevertheless, the Magistrate found independent source in the witnesses' trial testimony and under Federal law found no basis for relief; and reliance on the defendants' false account of the case and did not find that Lopez had committed perjury at trial. He also did not

credit the eyewitnesses' withdrawals of their identifications.  He recommended that the petition be denied.

193.    The District Court, relying on the defendants persistent deceptions and misrepresentations of the facts of the Bermudez case as presented by the DANY, entered judgment denying a writ of habeas corpus in March 2006.  The Court also denied a Certificate of Appealability.  While Mr. Bermudez's habeas counsel applied for a Certificate of Appealability from the Second Circuit, Mr. Bermudez sought counsel regarding another CPL 440.10 motion.

194.    In June 2006, the DANY began an investigation to try to obtain an alibi for Luis Munoz, under the direction of ADA Herculano Izquierdo.

195.    The initial investigation consisted only of computer database searches, but the investigators did find out that Munoz had changed his name to Alonzo, had an arrest in Kentucky in 1993, and had lived for many years in Mississippi and Florida.

196.    In April 2007, the *New York Times* published a front-page story about the Bermudez case, reciting facts that showed that the DANY and the police had arrested and prosecuted the wrong man.

197.    The DANY renewed its efforts to find and interview Munoz.

198.    In July 2007, the Second Circuit denied a Certificate of Appealability.

199.    In October 2007, DANY investigators found and interviewed Luis Munoz, for the first time, who was now living in New York again.  Luis Munoz acknowledged to DANY investigators that he was Wool Lou, because he used to smoke "wools," which is crack mixed with weed, just as Lopez had testified; that he had frequented clubs, and that he and Lopez had grown up together and broken into cars together.

200.    Munoz told the investigators that he had moved to Kentucky two years before the Blount homicide, which was provably false by reference to his June and September 1990 New York City arrest records.

201.    ADA Izquierdo did not disclose anything whatsoever about his investigation to Mr. Bermudez or his counsel.

202.    In April 2008, DANY investigators traveled to Kentucky to try to find corroboration for Munoz's statements to them that he had been working at a restaurant in Covington, Kentucky in August 1991, the time of the Blount homicide.  The investigators' extensive efforts failed.  There was no indication whatsoever of Munoz's presence in Kentucky before October 1991, two months after the Blount homicide.  ADA Izquierdo did not disclose this information to Mr. Bermudez or his counsel.

203.    On October 6, 2008, a new pro bono defense team filed a new CPL 440.10 motion in state court, claiming that the tainted identification procedures found by the Federal Magistrate Judge entitled Mr. Bermudez to a new trial, that Mr. Bermudez had had ineffective assistance of counsel for failure to investigate, that the many new facts accumulated since the trial had demonstrated beyond cavil that Lopez had identified Munoz as the shooter, and that Mr. Bermudez was actually innocent.

204.    It attached recently obtained documents showing that Munoz had changed his name to Alonzo and had moved to Kentucky by December 1991, and that Spencer Rivera (who was rumored to have been the person attacking people with a knife at the crime scene, and who had sought refuge in Wilfredo Maldonado's apartment after the shooting, together with Lopez) had lived with Munoz in Mississippi.

205.    Three weeks after the defense filing, the DANY investigators having found no corroboration whatsoever of Munoz's statements to them about his whereabouts at the time of the Blount homicide, ADA Herculano Izquierdo issued a subpoena to Equifax Credit Services to produce Munoz's credit report to the grand jury, in yet another attempt to find something to place Munoz somewhere other than in New York in August 1991.

206.    Apparently Munoz had not given the DANY permission to check his credit report, so ADA Izquierdo resorted to the power of the grand jury. This effort also failed.

207.    After the DANY had requested a number of adjournments in order to investigate the defense claims made in the CPL 440.10 motion, newly assigned ADA Peter Casolaro made available to the defense several documents regarding the DANY's failed attempt to corroborate Munoz's claimed alibi.

208.    In his response papers, he acknowledged that in fact Munoz was the person Lopez had referred to when, on August 5-6, 1991, he had named and described the shooter as Wool Lou, thus admitting that Lopez had in fact committed perjury at trial when he had identified Mr. Bermudez at trial as Wool Lou. He also acknowledged that, just as the defense had claimed in its motion papers, Munoz had been going by the name Alonzo since late 1991, and had moved to Kentucky.

209.    In response, the defense added claims of newly discovered evidence and prosecutorial knowledge of Lopez's perjury before entry of judgment under CPL 440.10(1)(g) and (1)(c), and attached to its papers the DANY documents demonstrating that Munoz had made false attempts at an alibi, which ADA Casolaro had made available to the defense.

210.    On August 6, 1991, Justice John Cataldo announced in court that a full hearing would be held on all the claims. His written decision indicated a preliminary finding that the

evidence of Lopez's perjury was grounds for a new trial and also strong evidence of Mr. Bermudez's actual innocence.

211.    On August 18, 2009, ADA Nancy Ryan met with the defense team, who invited her to join the defense motion in the interests of justice, given what the judge had already said about the case. ADA Ryan flatly refused this offer and instead made one of her own: a plea to manslaughter under which Mr. Bermudez would be sentenced to a term amounting to time served.

212.    Mr. Bermudez refused this offer as he steadfastly refused to plead guilty to a crime he did not commit.

213.    Justice Cataldo presided over the hearing on several dates in September 2009. Numerous witnesses were called by both parties. After reviewing the numerous exhibits in the case and reading the post-hearing submissions of the parties, Justice Cataldo issued a written opinion on November 12, 2009, declaring that the identifications were unduly suggestive; that ADA Rodriguez had known, or should have known, prior to the entry of judgment (September 1992) that Efrain Lopez had committed extensive material perjury at trial when he had identified Fernando Bermudez as Wool Lou, i.e., Luis Munoz (See, Exhibit A, Justice Cataldo's Decision and Order)

214.    Justice Cataldo ultimately ruled that that Mr. Bermudez was actual innocent of the crime (See, Exhibit A).

215.    Significant relevant excerpts of the 79 page decision read as follows:

THE DEFENDANTS KNOWLEDGE OF THE LOPEZ PERJURY PRE AND POST ARREST

> a.  It is now firmly established that: Mr. Lopez's entire story about Mr.
>     Bermudez being Woolu was a total fabrication. To date, more than

18 years after the shooting, absent this false testimony, no legitimate connection has been shown to exist between Mr. Bermudez and Efrain Lopez, or the group of Hispanic youths from the area of West 92nd street. (*See*, Exhibit A, Decision and Order, pp 21)

b.  I have taken into consideration the sworn habeas corpus testimony of A.D.A. Rodriguez, that as far back as 1992, before entry of judgment, he surmised that Efraim Lopez had lied when he testified the defendant was Wool Lou. I find this testimony alone demonstrates the People knew of the existence of Mr. Lopez's materially false testimony prior to the entry of judgment. (See, Exhibit A, pp. 29).

c.  However, even without this testimony, I find the evidence demonstrates that the People knew, or should have known, that Mr. Lopez's testimony was false prior to the entry of judgment. (See, Exhibit A, pp. 29).

d.  From the first time that A.D.A. Rodriguez interviewed Efraim Lopez on August 5, 1991, he was aware that Mr. Lopez knew the shooter's name was Lou or Luis. (See, Exhibit A, pp. 29).

e.  Instead, the prosecutor and the detective only asked questions about "Wool" Lou" throughout the remainder of the videotape. (See, Exhibit A, pp. 30)

f.  The failure to correct false or mistaken material testimony of a prosecution witness is a violation of a defendant's right to due

process of the law. (See, Exhibit A, pp. 30).

POST VERDICT PRE SENTENCE DEFENSE INVESTIGATION

g.  Mr. Gaynor(defense investigator) informed Det. Massanoa, that his information was that Wool Lou had fled to Virginia after the shooting (although Mr. Munoz had fled down south, we now know he fled to Kentucky and not Virginia). Mr. Gaynor provided the detective with two telephone numbers he had obtained for Munoz. (See, Exhibit A, pp. 32)

h.  He (Detective Massano) indicated, in a tape-recorded telephone conversation with Mr. Gaynor(Defense investigator), that he would be negligent if he failed to follow up on this lead (See, Exhibit A, pp. 31).

i. Although he later testified at the federal habeas proceeding that this criminal history information made him doubt the truth of Mr. Lopez's testimony, he(ADA Rodriquez) made no further efforts to look for Mr. Munoz or investigate his possible involvement in the homicide. Instead, he filed responding papers to defendant's CPL 330.30 motion, opposing-defendant's claim that Luis Munoz was the shooter. (See, Exhibit A, pp. 32).

j. In sum, I find that the prosecutor knew, or should have known, that Efraim Lopez gave materially false evidence prior to the entry of judgment. (See, Exhibit A, pp. 32)

216.    Obviously, if the prosecutor had knowledge that Lopez lied about the identity of the shooter, so too did Detective Massanova and other named defendants.

217.    In further support of all of plaintiff's claims, Justice Cataldo held "I credit Mr. Lopez's testimony from the habeas corpus proceeding that Det. Massanova discussed charging him as an accessory to murder if he didn't give up the shooter (Habeas Tr. 450). **This is supported by Det. Massanova's admission at the CPL 440 hearing that he believed Mr. Lopez was lying during his videotaped statement.** To this day, Det. Massanova believes Mr. Lopez was more involved in the death of Mr. Blount than he has admitted. (CPL 440 hearing Tr. 756-757) (See Exhibit A, pp 50)"

218.    Obviously, this confirms plaintiff's position that ADA Rodriquez, Massanova and others clearly knew, and therefore participated in, the presentation of materially false evidence to support the arrest and subsequent conviction of plaintiff.    Further, the defendants reached a mutual agreement with Lopez that they would not charge him in exchange for his false testimony against plaintiff.

219.    In fact, Justice Cataldo went on to state, "I do not credit ADA Rodriguez contention that he could not have charged Mr. Lopez as an accessory to Mr. Blount's murder. Instead, I find the Assistant chose not to charge Mr. Lopez with any crime to aid in the use of his testimony against the defendant at trial" (See, Exhibit A, pp 51).

AS TO THE UNCONSTITUTIONALLY TAINTED IDENTIFICATION PROCEEDURES

a.    After hearing extensive testimony of the identification procedures and a review of the proceedings in Federal Court, Justice Cataldo held in relevant part:

"At the federal habeas corpus proceeding, the four eyewitnesses testified they had mistakenly identified the defendant. Their testimony as to the manner in which they, collectively viewed photographs resulted in a

finding by United States Magistrate Judge Kevin Nathaniel Fox that unduly suggestive identification procedures had taken place." (See, Exhibit A, pp. 33).

"Judge Preska found that despite the fact that the photographic identification procedures were impermissibly suggestive, Magistrate Fox had. properly concluded that under federal law, the trial testimony of those witnesses as to the their identifications of Bermudez as the shooter were sufficiently reliable to uphold the conviction. "(See, Exhibit A, pp. 34).

"I do not credit Det. Fitzpatrick's testimony that the witnesses did not discuss the defendant's photograph." (See Exhibit A, pp. 40).

**"I find, based upon all the evidence before me, that the photographic identification procedures employed in this case were unduly suggestive in violation of the New York State and Federal Constitutions."** (See, Exhibit A, pp. 34).

220.    As to the finding of actual innocence, Justice Cataldo summarized the essence of this case as follows,

"To this day, 18 years later, once the false story that Mr. Bermudez was Woolu is removed from the trial evidence, we are left with the theory that Mr. Lopez approached the defendant, a total strangers, who immediately thereafter shot a man to death in retaliation for a minor altercation which had no connection to him. "(See Exhibit A, pp 53)

"I find no credible evidence connects Fernando Bermudez to the homicide of Mr. Blount. All of the People's trial evidence has been discredited: the

false testimony of Efraim Lopez and the recanted identifications of strangers. No other evidence supports a finding that Mr. Bermudez committed this crime. I find, be clear and convincing evidence that Fernando Bermudez has demonstrated he is innocent of this crime. Accordingly, the judgment of conviction is vacated and the indictment is dismissed." (See Exhibit A, pp 78)

221.    On November 20, 2009, Mr. Bermudez was released from Ossining Correctional Facility, having been incarcerated by New York State for eighteen years, three months, and fourteen days for a crime he had not committed.

## DAMAGES

222.    The actions of the defendants deprived Plaintiff Fernando Bermudez of his civil rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of New York.

223.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent and/or bad-faith acts and omissions of the defendants caused Fernando Bermudez to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve eighteen years, three months, and fourteen days in jail and prison for a crime he did not commit.

224.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith and omissions of the defendants caused Fernando Bermudez the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; loss of the normal parent child relationship: severe psychological damage; damage to business and property; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities

and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

225.    All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, mentally, recklessly, negligently, and/or with bad-faith and said acts meet all the standards for imposition of punitive damages.

COUNT 1 - 42 U.S.C. §1983 - False Imprisonment Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s) and ADA Rodriguez.

218.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

219.    False Imprisonment by their conduct and under color of law, defendants Lentini, Fitzpatrick, Massanova, Mulalley Mulcahy, John Doe(s) and Rodriguez, in his individual capacity and acting in an investigative role, deprived MR. BERMUDEZ of his constitutional right to be free from false imprisonment.

COUNT 2 - 42 U.S.C. §1983 - False Arrest Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s) and ADA Rodriguez.

220.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

221.    False Arrest by their conduct and under color of law, defendants Lentini, Fitzpatrick, Massanova, Mulalley Mulcahy, John Doe(s) and Rodriguez, in his individual

capacity and acting in an investigative role, deprived MR. BERMUDEZ of his constitutional

right to be free from false arrest.

>    COUNT 3 - 42 U.S.C. §1983 - Malicious Prosecution Against Against Defendant
>    Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy and John
>    Doe(s).

222.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs

and further alleges as follows.

223.    Malicious Prosecution by their conduct and under color of law, Defendants

Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy and Joe Doe(s) deprived MR. BERMUDEZ

of his constitutional right to be free from malicious prosecution.

>    COUNT 4 - 42 U.S.C. §1983 - 14th Amendment -Falsification of Evidence
>    Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley,
>    Mulcahy and John Doe(s).

224.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs

and further alleges as follows.

225.    The defendant police officers created and falsified evidence likely to influence a

jury's decision and forwarded that evidence to prosecutors thereby depriving plaintiff his

constitutional right to due process and a fair trial.

>    COUNT 5- 42 U.S.C. 1983- 14th Amendment -  Falsification Of Documents
>    Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley,
>    Mulcahy and John Doe(s).

226.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs

and further alleges as follows.

227.    The defendant Police Officers, Lentini, Fitzpatrick, Massanova Mulalley and

Mulcahy and Joe Doe(s) falsified documents likely to influence a jury's decision and forwarded

those documents to prosecutors thereby depriving plaintiff his constitutional right to due process

and a fair trial.

COUNT 6 - 42 U.S.C. §1983 - Conspiracy I Against the Defendants, Lentini, Fitzpatrick, Massanova, Mulalley Mulcahy and John Doe(s).

228.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

229.    Conspiracy, under color of law, the defendant police officers conspired with each other, ADA Rodriquez, Epriam Lopez and others reached a mutual understanding, and acted to undertake a course of conduct to deny, injure, oppress, threaten, trick, and deceive MR. BERMUDEZ in the free exercise and enjoyment of the rights and privileges secured to him by the Constitution, including the right to be free from unreasonable searches and seizures; right to counsel, right to remain silent and right to due process of the law;

330.    In further of the conspiracy the defendants:

   a)    falsely accused MR. BERMUDEZ as the shooter;

   b)    created evidence and documents falsely accusing MR. BERMUDEZ

   c)    suppressed facts concerning the true identity of the shooter;

   b)    engaged in unconstitutional identification procedures to illicit the false identification of MR. BERMUDEZ ;

   d)    submitted false reports, statements and evidence to further the conspiracy;

   e)    withheld relevant evidence and various Brady material which exonerated MR. BERMUDEZ of wrong doing;

   f)    Deliberately provided perjured testimony to the Grand Jury and Petit Jury; and

   g)    Conspired with the New York County District Attorney's Office, a separate entity, Mr. Lopez and others, to manipulate the evidence and

suppress the evidence.

COUNT 7 - 42 U.S.C. §1983- Brady Violations Against Defendant Police
Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy and John Doe(s).

331.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs
and further alleges as follows.

332.    The defendant Police Officers deliberately and/or with reckless disregard,
failed to disclose exculpatory and impeachment evidence concerning the Plaintiff thereby
depriving him of a fair trial and due process all in violation of federal law.

**PENDENT CAUSES OF ACTION**

333.    The allegation set forth in paragraph 1 through 332 are incorporated herein
by reference.

334.   Heretofore and on or about February 9, 2010, the plaintiff caused a written
verified Notice of Claim to be filed with and served upon the proper officers, agents and
employees of the defendant police officers and ADA Rodriguez and the New York State
Attorney General's Office pursuant to the statutes in such cases made and provided.  A copy of
the Notice is annexed hereto as Exhibit B and made a part hereof.

335.    That more than thirty days have elapsed since the service of such Notice of Claim,
and adjustment or payment thereof has been neglected or refused.

336.    The acts and conduct hereinbefore alleged constitute false arrest and
imprisonment, battery committed in performance of public duty or authority, malicious
prosecution, the deprivation of State law and constitutional rights based upon several grounds.
This Court has pendent jurisdiction to hear and adjudicate these claims.

COUNT 8 - Pendant Claim of False Arrest Against Defendant Police Officers,
Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s)and ADA
Rodriguez.

337.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

338.    MR. BERMUDEZ was wrongfully, unlawfully and unjustifiably charged and arrested without a warrant and without probable cause. The City is responsible for the false arrest because it occurred while the defendant(s) and other employees were acting in the scope of their employment.

### COUNT 9 - Pendent Claim of False Imprisonment Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s) and ADA Rodriguez.

339.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

340.    MR. BERMUDEZ was wrongfully, unlawfully and unjustifiably detained and deprived of his liberty against his will and imprisoned by defendant(s) without probable cause and without a warrant. The City is responsible for the false imprisonment of MR. BERMUDEZ because at the time the defendant(s) and other employees were acting within the scope of their employment.

### COUNT 10 - Pendent Claim of Malicious Prosecution Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy and John Doe(s).

341.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

342.    MR. BERMUDEZ was wrongfully, unlawfully, unjustifiably and maliciously prosecuted against his will between August 8, 1991 through November 9, 2009 during the majority of which he was incarcerated.

343.    The City is responsible for the malicious prosecution of MR. BERMUDEZ

because at the time the defendant(s) and other employees were acting within the scope of their employment.

COUNT 11 - State Law Claim for Negligent Infliction of Emotional Distress Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s) and ADA Rodriguez.

344. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

345. The defendant police officers and defendant Rodriguez, in his individual capacity, functioning as an investigator, negligently and grossly negligently, and in breach of their duties owed to him to refrain from fabricating evidence, coercing witnesses, withholding material, exculpatory and impeachment evidence, and otherwise acting to deny him due process of law, directly and proximately caused MR. BERMUDEZ, an innocent men, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for over eighteen years. Defendants' actions caused MR. BERMUDEZ to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post conviction incarceration.

COUNT 12 - State Law Claim for Intentional Infliction of Emotional Distress Against Defendant Police Officers, Lentini, Fitzpatrick, Massanova, Mulalley, Mulcahy, John Doe(s) and ADA Rodriguez.

346. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

345. The defendant police officers and defendant Rodriguez, in his individual capacity, functioning as an investigator, intentionally and recklessly, and in breach of their duties owed to him to refrain from fabricating evidence, coercing witnesses, withholding material, exculpatory and impeachment evidence, and otherwise acting to deny him due process of law, directly and

proximately caused MR. BERMUDEZ, an innocent men, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for nearly eighteen years. Defendants' actions caused MR. BERMUDEZ to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post conviction incarceration.

Count 13 - State Law Respondeat Superior Claim Against City of New York

346.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

347.    At all times relevant to this complaint the individual defendant police officers acted as agents of, and in the scope of their employment with, City of New York. The conduct by which defendants committed the torts of false arrest, malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while defendants were on duty, carrying out their routine investigative functions as NYPD detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer. Indeed, the specific conduct of defendant police officers was known by, should have been known by, and/or was reasonably foreseeable to NYPD supervisors.

348.    City of New York is liable for its agents' state law torts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

COUNT 14 - State Law Negligent Supervision Claim

349.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows.

350.    Defendant supervisors were grossly negligent and negligent in the training, supervision, and discipline of the defendant detectives.

351.    Defendant Supervisors knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendant police officers engaged in investigative misconduct including coercing witnesses, fabricating evidence, and failing to document and disclose material, exculpatory and impeachment evidence, and that they thereby caused MR. BERMUDEZ to be maliciously prosecuted and falsely arrested.

352.    As a proximate result of the gross negligence and negligence of defendant supervisors, defendant police officers engaged in the previously set forth misconduct and caused the above-described acts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress inflicted upon MR. BERMUDEZ, which directly and proximately caused his wrongful conviction and eighteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

**WHEREFORE,** Fernando Bermudez prays as follows:

A.    That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.    That the court award punitive damages to him, against all individual defendants, in the amount to be determined at trial, that will deter such conduct by defendants in the future;

C.    For a trial by jury;

D.    For pre judgment and post judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.    For any and all other relief to which he may be entitled.

Dated:  June 8, 2011

Respectfully Submitted,
LAW OFFICES OF MICHAEL S. LAMONSOFF, PLLC

Michael S. Lamonsoff (MSL_____)
Attorneys for Plaintiff
FERNANDO BERMUDEZ
80 Maiden Lane, 12th Floor
New York, New York 10038
(212)962-1020

Index No. 11 civ 0750
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FERNANDO BERMUDEZ,

Plaintiff,

-against-

THE CITY OF NEW YORK; ASSISTANT DISTRICT ATTORNEY
JAMES RODRIGUEZ, WHO IS OR WAS AN ASSISTANT
DISTRICT ATTORNEY OF NEW YORK COUNTY, IN HIS
INDIVIDUAL CAPACITY; MICHAEL LENTINI,
WILLIAM FITZPATRIC, DANIEL MASSANOVA,
JOHN MULALLEY, _____BAKER (FIRST NAME UNKNOWN),
AND ____MULCAHY (FIRST NAME UNKNOWN), AND
____ MULCAHY (FIRST NAME UNKNOWN), VARIOUS
JOHN/JANE DOES, WHO ARE OR WERE OFFICES OF THE
NEW YORK CITY POLICE DEPARTMENT, INDIVIDUALLY AND
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK,

Defendants.

---

## SUPPLEMENTAL SUMMONS AND AMENDED VERIFIED COMPLAINT

---

## LAW OFFICES OF MICHAEL S. LAMONSOFF, PLLC
### *Attorneys for PLAINTIFF*
**80 Maiden Lane, 12th Floor**
**New York, New York 10038**
**(212) 962-1020**

---

Pursuant to 22NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of the State of
New York, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the
annexed document are not frivolous.

_____
Attorney's Signature

*Michael S. Lamonsoff*
Print Signer's Name