UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

FERNANDO BERMUDEZ,                  :

                Plaintiff,          :

        v.                          :

THE CITY OF NEW YORK, JAMES         :
RODRIGUEZ, individually and         :
as Assistant District              :
Attorney of New York County,        :
ET AL.,                             :
                                    :
                Defendants.         :
-------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-14-13

11 Civ. 750 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

        Fernando Bermudez ("Plaintiff") brings this action

pursuant to 42 U.S.C. § 1983 ("section 1983") against Defendants

the City of New York, former Assistant District Attorney in New

York County James Rodriguez ("Rodriguez"), and various members

of the New York City Police Department ("NYPD").  Plaintiff

alleges Defendants conspired to violate his constitutional

rights in connection with his arrest and prosecution for a

murder perpetrated on the morning of August 4, 1991.  Plaintiff

also asserts a state law claim for negligent infliction of

emotional distress resulting from his imprisonment and seeks

compensatory and punitive damages.  Rodriguez now moves to

dismiss these causes of action[1] pursuant to Federal Rule of Civil

---

[1] In his Amended Complaint, Plaintiff asserts fourteen causes of
(continued)

1

Procedure 12(b)(6).[2]  For the reasons states below, Rodriguez's motion to dismiss [Dkt. No. 31] is GRANTED.

I.    BACKGROUND

       The Court takes as true the following factual allegations in the Amended Complaint and draws all reasonable inferences in favor of Plaintiff.  See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008).

       On August 6, 1991, two days after the murder of Raymond Blount ("Blount"), NYPD detectives arrested Plaintiff at

---

(continued)
action against Rodriguez, the City of New York, and members of the NYPD.  (See Am. Compl. ¶¶ 218-352.)  In his Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Opp."), Plaintiff concedes that Count 1 (false imprisonment), Count 2 (false arrest), Count 8 (false arrest), Count 9 (false imprisonment), and Count 12 (intentional infliction of emotional distress) should all be dismissed as against Rodriguez.  (See Pl. Opp. at 3-4.)  These causes of action are therefore dismissed with respect to Rodriguez.
       Plaintiff further concedes that Count 3, Count 4, Count 5, Count 7, and Count 10 do not pertain to Rodriguez.  (Id. at 4.)  Furthermore, Count 13 and Count 14 are relevant only to the causes of action against the City of New York and members of the NYPD.  (See Am. Compl. ¶¶ 346-352.)  Thus, only Count 6 (conspiracy) and Count 11 (negligent infliction of emotional distress) remain against Rodriguez.  Because these are the only two Counts that are subject to the instant motion to dismiss, the Court herein addresses no other claim raised in the Amended Complaint.

[2] Rodriguez states in his moving papers that he also seeks dismissal under Rule 12(b)(1) but fails to explain why the Court lacks subject matter jurisdiction over Plaintiff's claims, nor is the Court aware of any such reason.  Therefore, the Court analyzes the instant motion only according to the mandates of Rule 12(b)(6).

approximately 3:00 a.m., (see Am. Compl. ¶¶ 23, 29, 33, 37, 77),
after several eyewitnesses to the murder selected Plaintiff's
photo from a mug shot drawer and later in photo arrays presented
by the detectives at the CATCH Unit and the Sixth Precinct, (id.
¶¶ 51-52, 57, 64). Rodriguez arrived at the Sixth Precinct at
approximately 10:00 a.m., seven hours after Plaintiff's arrest.
(Id. ¶ 83.) Later that morning, at approximately 11:00 a.m.,
witnesses Kent, Thompson, Iyesi, and Velazquez each identified
Plaintiff as the shooter in what Plaintiff alleges was a
"suggestive" lineup. (Id. ¶¶ 78-80.) Plaintiff claims
Rodriguez "conferred with the other named defendants and
participated in the tainted line-up." (Id. ¶ 83.)
Specifically, Plaintiff alleges the lineup was tainted by the
prior, defective photo identification procedures instituted by
the detectives before Rodriguez's arrival. (Id. ¶ 80.)

Rodriguez interviewed the witnesses who viewed the
lineup and issued Thompson and Velazquez grand jury subpoenas
requiring their appearances on August 8, 1991. (Id. ¶ 83.)
While Rodriguez was interviewing witnesses at the Sixth
Precinct, Plaintiff alleges he spoke with Detective Massanova
and provided an account of his whereabouts at the time of
Blount's murder. (Id. ¶ 84.) Plaintiff denied participation in
the crime and provided an alibi. (Id.) Plaintiff's friends
subsequently arrived at the precinct and spoke with detectives

3

about their whereabouts on the night of the murder, confirming Plaintiff's alibi.  (Id. ¶ 85.)  Rodriguez learned of the statements Plaintiff's friends provided to Detective Massanova. (Id.)

At approximately 5:00 p.m. that day, Plaintiff spoke with Rodriguez.  (Id. ¶ 86.)  In that videotaped interview, Plaintiff admitted to being in and around the area of the Marc Ballroom—the site of the murder—during the early morning hours of August 4, 1991, but denied any knowledge of Blount's murder or of Ephrain Lopez ("Lopez"), the man who identified Plaintiff as the shooter.  (Id. ¶¶ 86-89.)

Rodriguez also interviewed Lopez.  (Id. ¶ 91.)  Prior to conducting that interview, Rodriguez knew that Plaintiff was being prosecuted for federal cocaine offenses.  (Id.)  During the interview, Lopez admitted to being at the Marc Ballroom, to being punched by Blount, to pointing out Blount to the shooter, and to believing "they" were only going to "beat Blount up." (Id. ¶¶ 91, 98.)  Lopez stated that he knew the shooter and, while they had "no relationship," Lopez knew the shooter as "Lou" or "Wool Lou" and proceeded to describe "Lou" generally. (Id. ¶¶ 92-94.)

At a later point in Lopez's interview, Detective Massanova brought in the photo array containing Plaintiff's unrelated marijuana arrest photo.  (Id. ¶ 95.)  It was the same

4

photo that Lopez had previously identified the night before.
(Id. ¶¶ 95-96.)  Rodriguez showed the photo array to Lopez, who
confirmed the individual depicted in Plaintiff's photo was the
individual he previously identified as the shooter, "Lou."  (Id.
¶ 95.)  Lopez also told Rodriguez that Plaintiff did not have
any of "that hair on his face" at the time of the shooting.
(Id.)  Lopez never admitted to knowing the shooter was going to
shoot Blount.  Following the interview, Lopez was allowed to
leave the precinct. (Id. ¶ 100.)

Rodriguez then conducted videotaped interviews of
Plaintiff's friends, who provided statements regarding their
whereabouts on the evening of Blount's murder.  (Id. ¶ 103.)
Those statements largely corroborated Plaintiff's own account,
save for minor details.  (Id. ¶ 104.)  On August 8, 1991, two of
the identifying witnesses—neither of whom was Lopez—testified
before a New York County grand jury.  (Id. ¶ 108.)  The grand
jury handed down an indictment charging Plaintiff with Blount's
murder.  (Id.)

Prior to trial, Plaintiff moved to suppress the
identification evidence.  On December 20, 1991, New York County
Supreme Court Justice John A.K. Bradley conducted a Wade
hearing.  (Id. ¶ 121.)  During that hearing, detectives
allegedly testified falsely about the identification procedures
they used.  (Id. ¶¶ 122-126.)  Plaintiff claims that despite his

counsel's attempts at the Wade hearing to uncover exculpatory evidence, Rodriguez successfully concealed certain Brady material.  (See id. ¶¶ 127-31.)  Plaintiff's motion to suppress the alleged tainted identifications was denied.  (Id. ¶ 132.)

Prior to trial, the New York County District Attorney's Office entered into a cooperation agreement with Lopez.  (Id. ¶¶ 133-35.)  Plaintiff alleges that the terms of the cooperation agreement provided that Lopez "would not be charged with the murder of Blount, if he testified against Fernando Bermudez."  (Id. ¶ 135.)  Plaintiff alleges that Rodriguez "directed" Lopez how he was to testify falsely about "Wool Lou."  (Id. ¶¶ 136-37.)  On February 6, 1992, following a trial in which each of the identifying witnesses testified, including Lopez, a jury found Plaintiff guilty of murder.  (See id. ¶¶ 146-47, 150, 158.)

Prior to sentencing, Plaintiff moved to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30, on the ground of newly discovered evidence.  (See id. ¶¶ 159-63.)  Plaintiff submitted various third-party affidavits averring that "Wool Lou," the nickname attributed to Plaintiff by Lopez, was actually a man named Luis Munoz.  (Id. ¶ 163.)  Additionally, Plaintiff's defense investigator showed a photo array with Plaintiff's and Munoz's photos to two of Blount's friends, neither of whom identified Plaintiff as the shooter.  (Id.

¶ 164.)   One of Blount's friends, however, identified Munoz as "the one most similar to the shooter." (Id.)   Subsequently, Rodriguez ran a criminal record check of Munoz and learned he had a criminal history similar to that of Lopez, from which Rodriguez "surmised" that Lopez "might have misidentified [Plaintiff] by name only to mislead the police." (Id. ¶ 166.) Relying on Rodriguez's arguments, Justice Bradley denied the motion to set aside the verdict. (Id. ¶ 170.)   On September 18, 1992, Plaintiff was sentenced to a term of twenty-three years to life in prison. (Id. ¶ 172.)

     Plaintiff alleges that on September 17, 1992, his investigator showed his photo array to one of the identifying witnesses who testified at trial, who identified Munoz as "the one most resembling the shooter." (Id. ¶ 171.)   On September 22, 1992, Plaintiff's investigator obtained an affidavit from Lopez claiming "Wool Lou" was Luis Munoz and that he was "coerced" into identifying Plaintiff out of fear of prosecution. (Id. ¶ 173.)   The identifying witnesses also later recanted, signing affidavits withdrawing their identifications and alleging they had been pressured to identify Plaintiff in court "with more confidence than they had really felt." (Id. ¶ 175.) Plaintiff filed several motions for post-judgment relief over the next few years, all of which were denied by Justice Bradley. (See id. ¶¶ 174-82.)   Plaintiff alleges that Rodriguez made

7

"numerous gross misrepresentations of fact" while refuting Plaintiff's allegations of suggestive procedures used at the CATCH Unit.  (<u>Id.</u> ¶ 177.)

On direct appeal, the Appellate Division for the First Department affirmed Plaintiff's conviction and rejected the trial witnesses' recantations as "inherently unreliable" and surrounded by "highly suspicious circumstances."  <u>People v. Bermudez</u>, 667 N.Y.S.2d 901, 901 (App. Div. 1st Dep't 1997). Plaintiff then filed a petition for habeas corpus in the Southern District of New York in June 2000.  (Am. Compl. ¶ 187.) In November 2002, Magistrate Judge Fox held a hearing on the claims of suggestive identification procedures and perjury, (<u>id.</u> ¶ 188), and ultimately recommended that Plaintiff's petition be denied, which this Court adopted in March 2006, (<u>id.</u> ¶¶ 192-93).

Plaintiff filed a new motion for post-judgment relief in state court on October 6, 2008.  (<u>Id.</u> ¶ 203.)  Following a full hearing, New York Supreme Court Justice John Cataldo ruled that Plaintiff was actually innocent and vacated the conviction. (<u>Id.</u> ¶¶ 214, 220.)  Plaintiff was released from state prison on November 20, 2009, after having spent over eighteen years in prison.  (<u>Id.</u> ¶ 221.)

II.  DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Rodriguez argues Plaintiff's Amended Complaint must be dismissed as against Rodriguez based on the doctrine of absolute immunity and for failure to state a claim upon which relief may be granted.  The Court agrees and discusses each ground for dismissal below.

A.  Legal Standard

In assessing a motion to dismiss under Rule 12(b)(6), the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in favor of the non-moving party.  Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A pleading must offer more than mere "labels and conclusions" or a "formulistic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Iqbal, 556 U.S. at 678 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 557).  A claim passes as

plausible when "the plaintiff pleads <u>factual content</u> that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 556 U.S. at 678 (emphasis added).

    B.   <u>Rodriguez Is Entitled to Absolute Prosecutorial Immunity</u>

Prosecutors are entitled to absolute immunity to section 1983 claims when performing activities "intimately associated with the judicial phase of the criminal process." <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430 (1976); <u>Warney v. Monroe County</u>, 587 F.3d 113, 120-21 (2d Cir. 2009).  Providing such immunity facilitates "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system."  <u>Imbler</u>, 424 U.S. at 427-28.

In determining whether the application of prosecutorial immunity is appropriate, courts look to the specific functions performed, not the identity of the actor. <u>See</u> <u>Warney</u>, 587 F.3d at 121.  That is, actions are not protected by absolute immunity simply because a prosecutor performs them; "rather, the question is whether the actions 'are part of a prosecutor's traditional functions.'"  <u>Parkinson v. Cozzolino</u>, 238 F.3d 145, 150 (2d Cir. 2001) (quoting <u>Doe v. Phillips</u>, 81 F.3d 1204, 1209 (2d Cir. 1996)).  When an action occurs in the

course of a prosecutor's role as an advocate, it is shielded by
absolute immunity.  <u>Imbler</u>, 424 U.S. at 430-31; <u>Warney</u>, 587 F.3d
at 121.

     The Supreme Court has held that prosecutors' function
as advocates during "the professional evaluation of the evidence
assembled by the police" and when preparing for their
"presentation at trial or before a grand jury after a decision
to seek an indictment has been made."  <u>Buckley v. Fitzsimmons</u>,
509 U.S. 259, 273 (1993); <u>accord</u> <u>Hill v. City of New York</u>, 45
F.3d 653, 661 (2d Cir. 1995).  The prosecutor's role as an
advocate, and therefore absolute immunity, may extend beyond the
initial judicial proceeding.  <u>See</u> <u>Warney</u>, 587 F.3d at 122-23;
<u>Spurlock v. Thompson</u>, 330 F.3d 791, 799 (6th Cir. 2003)
("Absolute immunity applies to the adversarial acts of
prosecutors during post-conviction proceedings, including direct
appeals[] [and] habeas corpus proceedings, . . . where the
prosecutor . . . continues his role as an advocate.").

     However, "[a] prosecutor's administrative duties and
those investigatory functions that do not relate to an
advocate's preparation for the initiation of a prosecution or
for judicial proceedings are not entitled to absolute immunity."
<u>Buckley</u>, 509 U.S. at 273; <u>Parkinson</u>, 238 F.3d at 150.  A
prosecutor functions in an investigatory capacity up and until

he has gathered sufficient evidence to demonstrate probable cause to effect an arrest.  See Hill, 45 F.3d at 662-63.

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  Burns v. Reed, 500 U.S. 478, 486 (1991). Further, the prosecutor's motivation for performing acts within the office's traditional functions is irrelevant.  Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994).  "This would even include . . . allegedly conspiring to present false evidence at a criminal trial."  Id.  Though the rule might sound harsh in this regard, the Supreme Court has determined that providing absolute immunity from civil redress arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties" and may prevent him from "exercising the independence of judgment required by his public trust."  Imbler, 424 U.S. at 423.  "Thus, while absolute prosecutorial immunity may leave an injured party without a remedy, society has found more benefit in insulating the exercise of prosecutorial discretion."  Flagler v. Trainor, 663 F.3d 543, 547 (2d Cir. 2011).

"'[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage . . . because . . . absolute immunity defeats a suit at the outset, so long as the official's actions were

within the scope of the immunity.'" <u>Watson v. Grady</u>, No. 09
Civ. 3055, 2010 WL 3835047, at *15 (S.D.N.Y. Sept. 30, 2010)
(first alteration in original) (quoting <u>Deronette v. City of New
York</u>, No. 05 Civ. 5275, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27,
2007)).  However, "when it may not be gleaned from the complaint
whether the conduct objected to was performed by the prosecutor
in an advocacy or an investigatory role, the availability of
absolute immunity . . . cannot be decided as a matter of law on
a motion to dismiss." <u>Hill</u>, 45 F.3d at 663.

          Here, to determine whether Rodriguez is entitled to
absolute immunity, the Court must decide the capacity in which
he was functioning when he committed the acts alleged by
Plaintiff.  The conduct on which Plaintiff predicates his causes
of action against Rodriguez may be summarized as (1) engaging in
unconstitutional identification procedures; (2) conspiring to
present falsified evidence to, and to withhold exculpatory
evidence from, a grand jury and a petit jury; (3) deliberately
suppressing <u>Brady</u> material; (4) fabricating evidence; and
(5) coercing witness testimony.  The Court addresses each of
these allegations in turn.

          As to the first act—engaging in unconstitutional
identification procedures—Plaintiff has not sufficiently pleaded
facts that suggest Rodriguez was acting in an investigatory
role.  Plaintiff often alleges that Rodriguez was "functioning

                              13

as an investigator," (e.g., Am. Compl. ¶ 82), or was "acting in his investigatory capacity," (e.g., id. ¶ 90).  However, "labeling various actions 'investigative' . . . in the complaint is of no moment."  Crews v. County of Nassau, No. 06 Civ. 2610, 2007 WL 4591325, at *15 n.15 (E.D.N.Y. Dec. 27, 2007). Critically relevant here is the fact that when Rodriguez arrived at the Sixth Precinct on the morning of August 6, 1991, Plaintiff had already been arrested by the police.[3]  (See Am. Compl. ¶¶ 77-83.)  Because Plaintiff had already been arrested by the time Rodriguez arrived at the police station, Hill suggests Rodriguez was not functioning in an investigatory capacity at that point in time.  See 45 F.3d at 662.

        Independently, Plaintiff's allegation that upon arriving at the police station Rodriguez "conferred with the other named defendants and participated in the tainted line-up," (Am. Compl. ¶ 83), is conclusory and does not give rise to a plausible inference that Rodriguez was acting outside his role as an advocate for the State.  Plaintiff fails to plead with

---

[3] The Court finds the contradictory nature of some of Plaintiff's allegations concerning the nature of the functions Rodriguez performed confusing, if not irreconcilable.  For example, Plaintiff alleges in one passage of the Amended Complaint that "[p]re-arrest, [Rodriguez] was functioning as an investigator rather than [as] an advocate of the Court."  (Am. Compl. ¶ 82.) Yet in the very next paragraph, Plaintiff alleges that Rodriguez arrived at the Sixth Precinct seven hours after Plaintiff's arrest, (id. ¶ 83), and Plaintiff offers nothing in the way of plausible involvement by Rodriguez prior to that time.

14

particularity how Rodriguez participated in the claimed tainted lineup.[4]  As such, Plaintiff's bald assertion "'stops short of the line between possibility and plausibility of entitlement to relief.'"  Iqbal, 556 U.S. at 678 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 557).

Furthermore, even if Rodriguez was present for the lineup, his presence there can plainly be characterized as being for the purpose of evaluating evidence, an act which is protected by absolute immunity.  See Buckley, 509 U.S. at 273. Plaintiff's allegations do not suggest Rodriguez's presence during the lineup was for any purpose other than evaluating and organizing evidence collected by the police for presentation to a grand jury and at trial.  "Interviewing [] witness[es] prior to bringing them before the grand jury to obtain an indictment is critical to a prosecutor's role as an advocate for the State."  Tabaei v. N.Y. City Health & Hosps. Corp., No. 11 Civ. 2013, 2011 WL 6778500, at *4 (S.D.N.Y. Dec. 21, 2011); see also Coakley v. 42nd Precinct Case 458, No. 08 Civ. 6206, 2009 WL 3095529, at *9 (S.D.N.Y. Sept. 28, 2009) (categorizing a prosecutor's attending a lineup as among those actions "intimately associated with the judicial phase of the criminal

---

[4] Furthermore, in the original Complaint, Plaintiff claimed that Rodriguez was unaware of any suggestive or tainted identification procedures used by the NYPD.  (See Compl. ¶¶ 123, 144, 256-58, 271.)

process" (quoting Imbler, 424 U.S. at 430-31)).  The allegations as to Rodriguez's participation in Plaintiff's lineup, therefore, do not defeat Rodriguez's claim to absolute immunity.[5]

The conduct of Rodriguez summarized above as the second and third acts, i.e., presenting falsified and incomplete evidence to a grand jury and suppressing Brady material, is clearly protected by the doctrine of absolute immunity.  First, several Courts of Appeals, including the Second Circuit, have consistently held that prosecutors are immune from civil liability under section 1983 for their conduct before a grand jury.  See Hill, 45 F.3d at 661 (citing Burns, 500 U.S. at 490 n.6 (collecting cases)).  Further, prosecutors are protected against allegations of their "knowing use of perjured testimony" at trial.  See Imbler, 424 U.S. at 431 n.34; Dory, 25 F.3d at 83 (noting that a prosecutor is immune from section 1983 liability for allegedly conspiring to present false evidence at trial). And the availability of absolute immunity is not precluded by the inclusion of a claim of conspiracy because the immunity "attaches to the function the prosecutor is performing, not the

---

[5] Just as Plaintiff fails to plead with particularity the extent of Rodriguez's participation in the alleged tainted lineup, it is unclear why Plaintiff believes the lineup was tainted in the first place.  Based on what can be gleaned from the Amended Complaint, however, Plaintiff appears to claim the lineup was tainted because of police conduct that occurred before Rodriguez arrived at the Sixth Precinct.  See infra note 6 and accompanying text.

way in which it is performed." Hill, 45 F.3d at 662 (citing
Dory, 25 F.3d at 83).  As to the alleged failure to turn over
Brady material, such failure occurred after Rodriguez was
functioning in his role as a prosecutor.  Accordingly, this
conduct is similarly immune from civil liability as a
discretionary—even if woefully inappropriate—advocacy function.
Hill, 45 F.3d at 662.

        Finally, because Plaintiff does not adequately plead
his claims that Rodriguez fabricated evidence and coerced
witness testimony he cannot withstand Rodriguez's absolute
immunity defense.  Plaintiff does not allege with sufficient
particularity that Rodriguez's interactions with identifying
witnesses, notably Lopez, occurred outside the scope of his
prosecutorial role as an advocate.  The "suggestive and
coercive" photo identification procedures to which Plaintiff
makes frequent reference, (e.g., Am. Compl. ¶¶ 139, 188),
occurred prior to Rodriguez's involvement in the case.  Indeed,
Plaintiff concedes Rodriguez was not present at the CATCH Unit
and did not arrive at the Sixth Precinct until after these
alleged improprieties occurred.  (Compare, e.g., id. ¶ 76 ("[A]t
around 11:00 p.m., [on August 5, 1991,] Detective Massanova
showed Lopez the photo array with the Bermudez mug shot.
Detectives Massanova and Mulalley improperly suggested to Lopez
that Bermudez was the shooter."), with id. ¶ 83 ("Rodriguez

17

arrived at the Sixth Precinct at around 10:00 a.m, August 6, 1991 . . . .").)[6]

Plaintiff further alleges that Rodriguez coerced Lopez to testify falsely by threat of prosecution. (See id. ¶¶ 98, 173.) Specifically, Plaintiff asserts that Rodriguez instructed Lopez to obscure the name "Wool Lou" by pronouncing it "Woolu," (id. ¶¶ 92-93), and that the threat of prosecution was used to force Lopez to give testimony consistent with the narrative created by Rodriguez and the NYPD that Plaintiff was the shooter, (id. ¶¶ 135-37, 151, 173). While such behavior, if true, is nothing short of reprehensible and would subject Rodriguez to criminal liability as well as professional discipline—just as would certain of the other claims of impropriety against Rodriguez—the Court must nevertheless apply the functional approach outlined in Imbler and grant absolute immunity where the conduct alleged was performed in Rodriguez's prosecutorial role as an advocate. See Kent v. Cardone, 404 F. App'x 540, 544 (2d Cir. 2011) (summary order).

---

[6] To the extent Plaintiff's allegation as to Rodriguez's participation in the tainted lineup forms part of the basis for Plaintiff's claim that Rodriguez fabricated evidence, the Court already rejected this allegation supra. Moreover, Plaintiff's Amended Complaint suggests it was the prior suggestive photo identification procedures, from which Rodriguez was admittedly absent, that "tainted" the lineup. (See Am. Compl. ¶ 80.) Because Rodriguez, as pleaded in the Amended Complaint, did not participate in the alleged improper photo identification procedures, these actions do not support any claim against Rodriguez.

At the time of the alleged misconduct, Rodriguez was interviewing Lopez to evaluate his testimony for presentation as a witness to a grand jury and at trial.  As stated previously the immunity attaches to the function, not the manner in which it was performed.  See Hill, 45 F.3d at 662; Dory, 25 F.3d at 83 (holding that the fact that a conspiracy to present false evidence was not something properly within the role of a prosecutor was immaterial in determining whether immunity applied).  Even if Rodriguez coerced false testimony he did so after police officers secured the witnesses and in his role as an advocate for the state.  Accordingly, Rodriguez is entitled to absolute immunity with respect to the claims that he fabricated evidence and coerced testimony.[7]

In sum, Plaintiff has not alleged sufficient facts to defeat Rodriguez's absolute immunity defense.  The Court thus

---

[7] As noted above, to the extent any of the alleged improper acts extended to proceedings beyond the initial trial phase, they are likewise protected.  "[B]y the nature of their office, prosecutors will necessarily remain involved in criminal cases," even after a conviction becomes final.  Warney, 587 F.3d at 121. Indeed, the initiation of judicial proceedings serves as the starting point for absolute immunity but "'does not serve to delineate the endpoint of immunity.'"  Id. at 122 (quoting Parkinson, 238 F.3d at 151).  For example, absolute immunity extends to a prosecutor's actions taken while working on a direct appeal, Parkinson, 238 F.3d at 151-52, and when defending a conviction from collateral attack, Warney, 587 F.3d at 122-23, insofar as the challenged actions are undertaken in the prosecutor's role as an advocate, id. at 123.  Here, because Rodriguez's alleged improper conduct falls directly within the prosecutor's advocacy function, his challenged actions are protected by absolute immunity regardless of when they occurred.

dismisses Plaintiff's Amended Complaint as to Rodriguez on this basis.

C.   Plaintiff Fails to State a Claim for Conspiracy Against Rodriguez

Even assuming, arguendo, that Plaintiff has sufficiently pleaded facts that suggest Rodriguez is not entitled to immunity because he was not acting within his prosecutorial role or because his role cannot be determined at this stage of the litigation, the conspiracy count against Rodriguez still must be dismissed on the merits for failure to state a claim upon which relief may be granted.[8]

A plaintiff must allege the following to survive a motion to dismiss a claim for conspiracy to violate section 1983: "'(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" Bullard v. City of New York, 240 F. Supp. 2d 292, 301 (S.D.N.Y. 2003) (quoting Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)). "'[C]onclusory' allegations of conspiracy are

---

[8] Rodriguez points out, and Plaintiff admits, that Rodriguez is not named in the heading of Count 6. However, it is clear from the remainder of the Amended Complaint that Plaintiff intended to allege a claim of conspiracy against Rodriguez. (See, e.g., Am. Compl. ¶¶ 100, 105-06.) Because Rodriguez reasonably had notice of the conspiracy claim and in light of the Court's preference to resolve claims on their merits, the Court will not deem this claim procedurally defective.

insufficient to survive a motion to dismiss." <u>Sudler v. City of New York</u>, No. 08 Civ. 11389, 2010 WL 68095, at *12 (S.D.N.Y. Jan. 8, 2010) (citing <u>Iqbal</u>, 556 U.S. at 678); <u>see also</u> <u>Walker v. Jastremski</u>, 430 F.3d 560, 564 n.5 (2d Cir. 2005).  Put another way, a plaintiff must allege facts that plausibly suggest a "'meeting of the minds,' such as that defendants 'entered into an agreement, express or tacit, to achieve the unlawful end.'" <u>Romer v. Morgenthau</u>, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (quoting <u>Warren v. Fischl</u>, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999); <u>see also</u> <u>Webb v. Goord</u>, 340 F.3d 105, 111 (2d Cir. 2003) (upholding dismissal of conspiracy claim where the plaintiffs did not allege, "except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants").

Here, the allegations in the Amended Complaint as to Rodriguez's participation in a conspiracy are merely conclusory. Plaintiff asserts that all Defendants, including Rodriguez, "conferred and agreed not to pursue" certain evidence, (Am. Compl. ¶ 100), "agreed not to disclose" certain information, (<u>id.</u> ¶ 101), "actively conspired to suppress the actual events," (<u>id.</u> ¶ 105), and "conspired . . . to permit [Lopez] to testify falsely," (<u>id.</u> ¶ 106).  Merely to assert that a conspiracy occurred, however, does not suffice.  Rather, Plaintiff must allege specific facts that, if taken as true, make it <u>plausible</u>

that Rodriguez had some agreement or understanding with the
other Defendants to commit the alleged constitutional
violations.  Plaintiff, however, fails to do so.  While
Plaintiff alleges certain wrongdoings committed by both
Rodriguez and members of the NYPD, (see, e.g., id. ¶ 83
(participation in the tainted lineup); id. ¶¶ 86-87 (interview
of Bermudez); id. ¶¶ 91-98 (interview of Lopez)), nothing in the
Amended Complaint plausibly suggests that these acts were done
in furtherance of an agreed upon conspiracy.

Plaintiff's arguments in his opposition are
unavailing.  Plaintiff merely reiterates that Defendants "agreed
not to pursue the investigation any further" and "agreed to
suppress the actual events of the night in question." (Pl. Opp.
at 9.)  Again, these are nothing more than mere conclusions
couched as factual allegations.  Plaintiff fails to show, for
example, how Rodriguez and the NYPD officers conspired together
when Lopez was not called as a witness before the grand jury.
Instead, he merely concludes that "Defendants intentionally
elected not to call Lopez." (Am. Compl. ¶ 108.)  But nothing
Plaintiff alleges suggests Rodriguez's decision not to call
Lopez as a witness was based on a conspiracy between Rodriguez
and members of the NYPD rather than due to Rodriguez's
individual discretion as a prosecutor.

Further, despite Plaintiff's suggestion, the pleading standard set forth in <u>Twombly</u> and <u>Iqbal</u> is not a numbers game; the sheer volume of facts alleged, two hundred and twenty-five, does not turn a legal conclusion into a plausible inference. <u>See Twombly</u>, 550 U.S. at 556-57 (rejecting a conspiracy in restraint of trade claim, explaining that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). Plaintiff also fails to allege at what point the meeting of the minds occurred. And, as noted previously, some of the conspiratorial acts alleged, such as "unconstitutional identification procedures," (<u>see</u> Pl. Opp. at 8), transpired prior to Rodriguez's involvement in the case.

Accordingly, because Plaintiff has not alleged sufficient factual matter to suggest plausibly that Rodriguez, acting in concert with NYPD officers and detectives, agreed to conspire against Plaintiff in violation of his constitutional rights, Plaintiff's conspiracy claim against Rodriguez must be dismissed on the merits for failure to state a claim upon which relief may be granted.

D.    <u>The Court Declines to Exercise Supplemental
      Jurisdiction over Plaintiff's Remaining Claim Against
      Rodriguez</u>

Plaintiff has also brought a claim of negligent infliction of emotional distress under New York state law.

Because the claim over which this Court has original jurisdiction has been dismissed, see supra Parts II.B-C, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim against Rodriguez.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

III. CONCLUSION

        For the reasons stated above, Rodriguez's motion to dismiss [Dkt. No. 31] is GRANTED.


SO ORDERED.

Dated:    New York, New York
          February _13_, 2013


                              _Loretta A. Presley_
                              UNITED STATES DISTRICT JUDGE